RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0283p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

GREGORY RICE,

        *Petitioner-Appellee,*

    *v.*

JEFF WHITE,

        *Respondent-Appellant.*

No. 10-1583

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 06-11610—Denise Page Hood, District Judge.

Argued: July 26, 2011

Decided and Filed: October 24, 2011

Before: CLAY and STRANCH, Circuit Judges; BARRETT, District Judge.[*]

─────────────────

## COUNSEL

**ARGUED:** John S. Pallas, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Gary P. Supanich, GARY P. SUPANICH PLLC, Ann Arbor, Michigan, for Appellee. **ON BRIEF:** Brad H. Beaver, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Gary P. Supanich, GARY P. SUPANICH PLLC, Ann Arbor, Michigan, for Appellee.

─────────────────

## OPINION

─────────────────

CLAY, Circuit Judge. Respondent Jeff White, Warden, appeals the district court's grant of a conditional writ of habeas corpus to Petitioner Gregory Rice pursuant

─────────────────

[*] The Honorable Michael R. Barrett, United States District Judge for the Southern District of Ohio, sitting by designation.

to 28 U.S.C. § 2254.  For the reasons discussed below, we **AFFIRM** the decision of the district court.

## BACKGROUND

Petitioner Gregory Rice and his co-defendant Jerome Knight were charged with first degree murder, in violation of Michigan Compiled Laws ("M.C.L.") § 750.316, for the murder of Knight's former girlfriend, Yahnica Hill.  Petitioner was also charged with one count of possession of a firearm during the commission of a felony in violation of M.C.L. § 750.227b.  Petitioner and Knight were tried jointly by a jury in the Wayne County Circuit Court.  The instant habeas petition focuses on jury selection, which spanned three days, from July 26 to 28, 1999.

During the morning session on the third day of jury selection, July 28, 1999, defense counsel objected "that the prosecution is attempting to exclude black juro[r]s from this particular jury; particularly black men."  (Tr. at 53.)  Defense counsel's objection constituted an allegation that the prosecution was using its peremptory challenges during jury selection to exclude potential jurors from the jury on the basis of race in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).  The trial judge inquired into the matter, and the prosecutor stated that she struck one African American male; two African American females; three white men; and a white female.  (*Id.* at 55.)  After a brief exchange in which the prosecutor stated her reasons for striking these jurors, the trial judge denied the *Batson* motion, stating, "I do not see a pattern of the prosecution improperly excluding African American males. . . . I think the reasons are acceptable. So I don't see a problem here."  (*Id.* at 58.)

After a recess for lunch, the judge excused a juror for cause and selected Ms. Ruby Jones from the jury venire as a replacement prospective juror.  (*Id.* at 59.)  Ms. Jones answered certain basic questions pertaining to her qualifications to serve as a juror. (*Id.* at 59–69.)  After two additional potential jurors were struck, the court selected Ms. Christina Johnson and Ms. Bonita Bonner as replacement prospective jurors.  (*Id.*)  After questioning by the court and the attorneys, the prosecutor exercised peremptory

challenges against both Ms. Johnson and Ms. Bonner, and the defense exercised a peremptory challenge against another potential juror. The trial court accordingly replaced these individuals with others from the pool of potential jurors. (*Id.* at 75.)

After questioning the replacement prospective jurors, defense counsel exercised a peremptory challenge, and the prosecutor exercised a peremptory challenge against Ms. Jones. At that point, defense counsel requested an opportunity to approach the bench, and the trial court responded, "Yes. Let me have the jurors step out in the hall for a few minutes." (*Id.* at 85.) After the potential jurors left the courtroom, defense counsel objected under *Batson* to the prosecutor's peremptory strike of Ms. Jones. Defense counsel argued that the prosecutor had used peremptory challenges to strike three African American women from the jury on the basis of race. (*Id.* at 86.)

In response to defense counsel's argument, the trial court stated: "Miss Jones still out there?" That question went unanswered, and without waiting for the trial court to rule on whether the defense had presented a prima facie case of discrimination, as is required under *Batson*, the prosecutor proffered race-neutral reasons for her three prior peremptory strikes, which the prosecutor conceded were against African American females—Ms. Bonner, Ms. Johnson, and Ms. Jones.

First, as to Ms. Bonner, the prosecutor stated:

> Miss Bonner the reason that I struck her, she has been very closely related to two people that have been charged in and convicted with murder in the first degree. Although she indicates she can be fair, I think that having had such close associations with people that have had similar charges is something that would make me strike here. I believe that's an appropriate reason. It is not because she is black.

(*Id.* at 86–87.) Second, as to Ms. Johnson, the prosecutor stated:

> Miss Johnson indicated that -- looking at her body language when she was seated and the tone of her voice and the look that she gave when she indicated that she could be fair; she was hesitant in her demeanor. And she also indicated that she had a close relative that was convicted of a drug charge. And although she indicated that she could be fair, she was very reticent in terms of her demeanor.

(*Id.* at 87.)  Finally, as to Ms. Jones, the prosecutor stated:

> Miss Jones, the person that was last dismissed, is a person that has a child that's close in age to the victim in this case.  She's a person that is a working person that is in some type of professional position at Blue Cross.  In this case we have a young woman who [was killed] . . . . Miss Jones . . . has a daughter that may be different from our victim.  And she may view the life style of this victim and compare and contrast that with her own child.  I don't think that that should enter into it.  She indicated that she could be fair.  But the reason that she was stricken is because young woman whose life-style in this case maybe significantly varying from her own daughter and from the background she is from.  So therefore she was stricken.

(*Id.*) The trial court then interjected:

> Just before we recessed for lunch, I thought that it was very clear that we didn't have a problem here. But now I think we are getting very close to a sensitive issue.  I didn't see a problem with . . . Christine Johnson.  She was, actually her demeanor was soft and she seemed very forthright and honest.  And I understand with Miss Bonner, I didn't see any problems with that.
>
> But I was very surprised about Miss Johnson.  I didn't say anything because the defense didn't object.  So I didn't object.
>
> The same thing with Miss Jones.  I do not see a reason other than – I mean, it seems to me for the prosecution to say, she has a daughter the same age as the victim, that would seem to work in the prosecution's favor, just in terms of thinking in the jury selection.  So I don't accept that. . . .
>
> I do see that we are getting close, and there are, I don't know two or three minority jurors left in this panel.  So I think we are getting close to a serious issue here.  I wish that somebody had said something about keeping Miss Jones and Miss Johnson.  And then we address this matter because I probably would not have excused either one of them. . . .
>
> The only reason I mention Johnson at the time is because the prosecution excused both Miss Johnson and Miss Bonner at the same time.  I saw a reason for Miss Bonner. I didn't see a reason for Miss -- but I wasn't going to interfere.  I do, but I say, if some, if an objection had been made as far as Miss Johnson and Miss Jones I probably would have addressed it.  And I tend to think I probably would have kept them on the jury.

(*Id.* at 89–90 (internal paragraph breaks added).)

The following colloquy subsequently ensued between the prosecutor and the trial court:

> PROSECUTOR:      Your Honor, may I just make a record here?
>
> THE COURT:       Sure, sure.
>
> PROSECUTOR:      Under *Batson v. Kentucky,* . . . . [a]s long as I come up with a neutral reason for their dismissal, I believe that that's appropriate.
>
> THE COURT:       But the Court has to accept or reject whether the reason is neutral or not.
>
> PROSECUTOR:      I understand.
>
> THE COURT:       And I'm not, I'm saying that I think we're getting close to a sensitive issue here on Jones and Johnson. That's all I'm saying. I'm making my record too.
>
> PROSECUTOR:      . . . . Miss Johnson in terms of her reticent demeanor, this is going to be a very interesting case for these people to decide in terms of who can stand up and who has a strong enough personality. In terms of her reticent demeanor, I'm not sure that she would stand up in a jury. She's barely is audible when she speaks.
>
> THE COURT:       Why didn't you ask her that? You didn't ask any questions of any of these jurors. You just simply are excusing them.
>
> PROSECUTOR:      I think that they have given me the neutral reason. And I don't think that there is anything that says that I have to question them if I can give a neutral reason.

(*Id.*)

At this point, the prosecutor lodged her own *Batson* objection to the peremptory strikes made by defense counsel, claiming that defense counsel struck white potential jurors on the basis of their race. The prosecutor stated:

> Except for one person [] who is a black female, that was excused yesterday. We have people who said that they could be fair in each instance[.] And we have . . . five white females[] that have been excused by defense counsel for Knight. I would indicate that that, [sic] Miss Oumedian, Miss Enmery, Miss Ignacio, Miss Acosta, and . . . Miss Farris

are all similarly white females saying that they could be fair and have been dismissed.

Now at this point, I'm going to hava [sic] a *Batson* challenge because that can be challenged with the defense. So I'm indicating the same thing. I've been prudent in terms of waiting for this and looking at it. And I believe that they are not being released except for they are white.

(*Id.* at 91–92.) Defense counsel denied the prosecutor's allegations, but focused again on the prosecutor's peremptory strikes. (*Id.* at 92–93.) The following colloquy ensued:

| | |
|---|---|
| DEF. COUNSEL: | []I don't think the Court ruled on whether or not you're going to allow Miss Jones to be struck. She's still downstairs, I'm sure. |
| THE COURT: | I don't know if she is or not. |
| PROSECUTOR: | It [sic] thought she was held. |
| THE COURT: | If she is still here, I'm going to keep her. |
| DEF. COUNSEL: | Thank you. |

(*Id.* at 92–93.) Following this colloquy, a deputy informed the trial judge that Ms. Jones "had already gone." (*Id.* at 93, 96.)

The trial judge then permitted defense counsel to make a record as to the prosecutor's *Batson* challenge. Counsel explained that he struck only individuals who he did not believe gave "candid answers." (*Id.* at 93.) After a back and forth between the parties, the trial court stated:

We have to be realistic here. I really don't want any problems with this case, especially along these lines. I'm not satisfied with the prosecutor's response as to potential juror Jones and Johnson. But I think they've already left.

So I'm going to say from this point on let's be very careful about the selection. If you think that you, if the defense is not satisfied with me just giving a cautionary instruction to the prosecution, then I'll address any other remedy. But realistically I think all of us are being, trying to be conscientious about the selection of these jurors because of the racial makeup of the jury panels, which we don't have any control over.

> I'm just saying, I let Jones and Johnson go without holding them, especially Jones. I guess I should have held her and I didn't do that. I'll take the fault for that. But from this point on let's try to be careful with this jury selection. We are too close to getting this jury selected.

(*Id.* at 95–96.) After the trial judge satisfied herself that Ms. Jones could not be located, the court remarked: "I don't think it is serious enough at this point. We do have some minorities left on the jury panel and I'll be watching this closely." (*Id.* at 96.) The trial court continued with jury selection, and before adjourning court, stated:

> With the panel that we ended up with, I think that any *Batson* problems that may have been there have been cured. We have the same number if not more jurors, African American female jurors on the panel as if we had kept Miss Christina Johnson and Miss Ruby Jones.
>
> I don't think either side ended up selecting this panel for any reason other than . . . these are the ones who will be the fair and impartial persons to hear and try this case.

(*Id*. at 131–32.) The trial court empaneled the jury the next day, on July 29, 1999.

At trial, the prosecution's theory was that Knight bailed Petitioner out of jail in exchange for Petitioner's agreement to murder the victim. Petitioner denied his guilt and claimed that he used his own money to post bond and was at his grandmother's home at the time of the shooting. Petitioner contends on habeas that no physical evidence connected him to the murder. On August 20, 1999, the jury returned verdicts of guilty on all counts against Petitioner and Knight. On September 17, 1999, the trial court sentenced Petitioner to life imprisonment for first degree murder and a consecutive two-year term of imprisonment for the felony firearm conviction.

Following Petitioner's conviction and sentence, Petitioner filed a direct appeal in the Michigan Court of Appeals, seeking to overturn his conviction on the basis of, among other things, the sufficiency of the evidence; the jury instructions; and ineffective assistance of counsel. On October 15, 2002, the Michigan Court of Appeals affirmed his conviction. *See People v. Rice*, No. 225865, 2002 WL 31310158 (Mich. Ct. App. Oct. 15, 2002) (per curiam).

Petitioner thereafter filed a delayed application for leave to appeal in the Michigan Supreme Court, raising many of the same claims. On June 19, 2003, the Michigan Supreme Court vacated "the portion of the judgment of the Court of Appeals concerning defendant's peremptory challenge issue under *Batson v. Kentucky*" and remanded the case "for reconsideration of that issue."[1] *People v. Rice*, 664 N.W.2d 214 (Mich. 2003) (table). In remanding the case, the supreme court explained:

> [The] [t]rial transcript indicates that the trial judge was not satisfied with the prosecutor's race neutral reasons for peremptorily dismissing several jurors. Tr. at 95. Court of Appeals based its judgment on the premise that the trial court rejected the *Batson* challenge and, in doing so, the Court of Appeals also appears to have failed to follow *Miller-El v. Cockrell*, 537 U.S. 322 (2003) (holding that evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within the trial judge's province).
>
> We remand to the Court of Appeals for reconsideration of whether the trial judge erred in finding a *Batson* violation. If the Court finds that the trial court did not err, the Court shall address whether the trial court was correct in ruling that the racial composition of the final jury cured any *Batson* violation that was not cured due to the failure to reseat the peremptorily dismissed jurors.

*Rice*, 664 N.W.2d at 214 (paragraph break added) (internal citation omitted).

On remand, the Michigan Court of Appeals affirmed. The court noted that it was "somewhat puzzled" by the remand because "there was no specific finding [by the trial court] of a *Batson* violation." *People v. Rice*, No. 225865, 2003 WL 22299839, at *2 (Mich. Ct. App. Oct. 7, 2003). Nevertheless, the court assumed that the trial court found a *Batson* violation and affirmed, holding that "the record does not support a conclusion of purposeful discrimination, and the court erred in finding a *Batson* violation." *Id.* Petitioner filed an application for leave to appeal with the Michigan Supreme Court,

---

[1] Although Petitioner did not raise a *Batson* claim in his direct appeal, Petitioner's co-defendant, Knight, raised the issue in his parallel direct appeal, and the Michigan Supreme Court consolidated the appeals and considered the *Batson* claim for purposes of both appeals; therefore, because the state courts adjudicated the claim on the merits as to Petitioner, there is no procedural bar to our review. *See, e.g.*, *Guilmette v. Howes*, 624 F.3d 286, 292 (6th Cir. 2010) (en banc).

which the court granted as to the *Batson* claim, and consolidated with an appeal filed by Knight. *See People v. Knight*, 682 N.W.2d 85 (Mich. 2004) (table).

On July 21, 2005, in a 4–3 decision, the Michigan Supreme Court affirmed the decision of the intermediate appellate court. *See People v. Knight*, 701 N.W.2d 715 (Mich. 2005). As a "threshold matter," the court observed that this case was "difficult, in large part, because of the trial judge's failure to rigorously follow the *Batson* procedures and, more importantly, to clearly articulate her findings and conclusions on the record." *Id.* at 730. Nonetheless, based on the court's "reading of the voir dire transcripts," the court concluded "that the trial court did not, in fact, find a *Batson* violation and, thus, there is no error to complain of in these cases." *Id*. The court explained:

> The trial judge's initial expression of dissatisfaction with the prosecutor's race-neutral reasons, when considered in context with her subsequent remarks that "we are getting close to a sensitive issue," related to her concern about the number of minority veniremembers left on the panel. The judge further articulated her actual motivation in the following excerpt: "I think all of us are being, trying to be conscientious about the selection of these jurors because of the racial makeup of the jury panels, which we don't have any control over." The trial judge's remarks do not reflect a finding that the prosecutor engaged in purposeful discrimination. Rather, the comments demonstrate that her true motivation was to ensure some modicum of racial balance in the jury panel. Use of peremptory challenges, however, to ensure racial proportionality in the jury is prohibited by *Batson* . . . .

> The trial judge never expressly found that the prosecutor exercised peremptory challenges for a racially discriminatory reason. In fact, her comments at the end of jury selection suggest a contrary conclusion. The trial judge was more concerned with achieving a proportionate racial composition on the jury than with the exclusion of veniremember Jones. She ultimately concluded that no *Batson* violation existed because a satisfactory number of African-American females were still [] on the jury.

> We reject [the] conclusion that the trial judge ever found that defense counsel met his burden of proving purposeful discrimination. Rather, the trial judge's focus, as her comments reflect, was to ensure that the racial composition of the jury remained proportionate.

. . . . [The trial judge's] *Batson* analysis seemed to be infused with and confused by the erroneous belief that *Batson* is violated if the challenge resulted in too few minority jurors.  The trial judge's statements did not imply that she would have kept Jones and Johnson on the jury because she thought they had been wrongfully excluded on the basis of race.  Rather, her statements implied that she would have kept them on the jury to ensure that the number of African-American jurors remained proportionate to the number of Caucasian jurors.

The trial judge failed to recognize that a defendant is not entitled to a jury of a particular racial composition as long as no racial group is systematically and intentionally excluded.  Defendants' jury was drawn from a fair cross section of the community.  Nor was any racial group systematically excluded.

*Id.* at 730–31 (internal citations omitted).

Three justices dissented in part, concluding that  "the only conclusion that can be fairly drawn is that the trial court believed that veniremembers Johnson and Jones were improperly excluded from the jury pool on the basis of race."  *Id.* at 735 (Cavanagh, J., concurring in part, dissenting in part).  Because the trial court nonetheless proceeded with the trial without discharging the venire, the dissent viewed the "error [as] subject to automatic reversal."  *Id.* at 740.

On April 4, 2006, Petitioner filed a *pro se* petition for a writ of habeas corpus in the district court, raising numerous claims for relief, including a *Batson* claim.  The district court on March 31, 2010 issued a conditional writ of habeas corpus on the basis of a *Batson* violation, explaining:

[T]he state's highest court unreasonably determined the facts in light of the evidence presented at trial, the state trial court incorrectly applied *Batson*, and Petitioner was not afforded the only remedy that existed at the time, "to discharge the venire and select a new jury from a panel not previously associated with the case."  *Batson*, 476 U.S. at 99, n.24.

(Dist. Ct. Op. at 39.)  The Warden thereafter filed this timely appeal.

## DISCUSSION

The Warden appeals the district court's grant of a conditional writ of habeas corpus pursuant to 28 U.S.C. § 2254(d)(2).  The district court concluded that the Michigan Supreme Court's adjudication of Petitioner's *Batson* claim was based on an unreasonable determination of the facts in light of the evidence, within the meaning of 28 U.S.C. § 2254(d)(2), and that Petitioner's constitutional right to equal protection was violated by the state trial court, requiring the issuance of a conditional writ of habeas corpus.  For the reasons explained below, we **AFFIRM**.

### I.    Standard of Review

Our consideration of Petitioner's claim begins with a thorough discussion of the standards that guide our decision.  We review *de novo* the district court's grant of habeas relief and review the underlying state court judgment pursuant to 28 U.S.C. §§ 2241 and 2254.  *See, e.g.*, *Braxton v. Gansheimer*, 561 F.3d 453, 457 (6th Cir. 2009).

Section 2241 of Title 28 of the U.S. Code provides that "[w]rits of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions."  28 U.S.C. § 2241(a).  The statute is an affirmative grant of power to federal courts to issue writs of habeas corpus to prisoners being held "in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c); *see also United States v. Mauro*, 436 U.S. 340, 357 (1978).  Federal courts have long treated § 2241 as a grant of general jurisdiction over habeas claims, and, until recently, federal courts would routinely exercise their "independent judgment when deciding both questions of constitutional law and mixed constitutional questions, . . . ow[ing] no deference to a state court's resolution of such questions of law or mixed questions."  *Williams v. Taylor*, 529 U.S. 362, 400 (2000) (O'Connor, J., concurring).

This changed with the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which imposed significant limitations on the authority of federal courts to grant writs of habeas corpus to state prisoners.  AEDPA, which is

codified in relevant part at 28 U.S.C. § 2254, is not a "separate source of habeas jurisdiction" from the grant of general jurisdiction in § 2241(a). *Rittenberry v. Morgan*, 468 F.3d 331, 337 (6th Cir. 2006); *see also Williams*, 529 U.S. at 379.  It instead "implement[s] [existing] authority with respect to state prisoners." *Allen v. White*, 185 F. App'x 487, 486 (6th Cir. 2006) (citing *Medberry v. Crosby*, 351 F.3d 1049, 1060 (11th Cir. 2003) (stating that AEDPA is "more in the nature of a limitation on authority than a grant of authority")).

The limitations imposed by AEDPA are several and significant.  *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398–1401 (2011) (noting the congressional intent to channel state prisoner claims to state courts to further the policies of comity, finality, and federalism).  Consistent with § 2241, § 2254(a) authorizes a federal court to "entertain only those applications alleging that a person is in custody 'in violation of the Constitution or laws or treaties of the United States.'" *Id.* at 1398 (quoting 28 U.S.C. § 2254(a)); *Wilson v. Corcoran*, 131 S. Ct. 13, 17 (2010) (holding that habeas is not available for violations of state law).  "Sections 2254(b) and (c) provide that a federal court may not grant such applications unless, with certain exceptions, the applicant has exhausted state remedies." *Cullen*, 131 S. Ct. at 1398 (citing 28 U.S.C. §§ 2254(b), (c)).  Section 2254(e) provides that "a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Most relevant to this case, subject to two exceptions, § 2254(d) bars the relitigation of claims that were "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d); *see also Harrington v. Richter*, 131 S. Ct. 770, 787 (2011).  Under the two exceptions set forth in subsections §§ 2254(d)(1) and (2), a federal court may permit relitigation of a claim adjudicated on the merits in state court if the state adjudication of the claim either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . . ; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §§ 2254(d)(1), (2).  With regard to the latter exception, it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was "based on" that unreasonable determination.  *See, e.g.*, *Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011) (holding that although the petitioner met his burden under § 2254(d)(2), the state court decision was not based on that determination, thereby barring relitigation of the claim).

Taken together, §§ 2254(a)–(e) make clear that a federal court sitting in review of a state court judgment owes great deference to that judgment.  AEDPA deprives a federal court of authority to grant relief to a state prisoner on the basis that the federal court concludes, in its independent judgment, that a violation of federal law has occurred.  More is required, and the Supreme Court has reiterated as much in a series of recent decisions.  *See, e.g.*, *Cullen*, 131 S. Ct. at 1398 (holding that a federal court may not take additional evidence in a habeas proceeding under § 2254(d)(1) because the evidentiary record is "limited to the record that was before the state court that adjudicated the claim on the merits"); *Harrington*, 131 S. Ct. at 784 (holding that unexplained state court decisions are entitled to deference as decisions on the merits under § 2254(d)(1), and therefore the petitioner's "burden still must be met by showing there was no reasonable basis for the state court to deny relief"); *Premo v. Moore*, 131 S. Ct. 733 (2011) (reversing a court of appeals' decision that state court decision involved an unreasonable application of *Strickland* pursuant to § 2254(d)(1)); *Renico v. Lett*, 130 S. Ct. 1855, 1866 (2010) (holding that a state court's failure to apply federal circuit court precedent did not constitute an independent ground for habeas relief).

Despite the great deference accorded state court adjudications of federal claims, AEDPA, of course, "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Harrington*, 131 S. Ct. at 786.  Federal

courts retain statutory and constitutional authority, absent suspension of the writ,[2] to remedy detentions by state authorities that violate federal law, so long as the procedural demands of AEDPA are satisfied. *See Harris v. Haeberlin*, 526 F.3d 903, 910 (6th Cir. 2008) ("[E]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review." (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 324 (2003))).

Because AEDPA, read properly, is a limitation on the otherwise broad equitable power of federal courts to grant writs of habeas corpus, and is not itself an affirmative grant of authority,[3] the deference AEDPA demands is only as strong as the limitations it imposes. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (performing *de novo* review under *Strickland*'s second prong because the state court unreasonably applied the law in resolving *Strickland*'s first prong).

In *Panetti v. Quarterman*, 551 U.S. 930, 947 (2007), for instance, the Supreme Court considered a habeas application filed by a state prisoner alleging unlawful detention in violation of the Eighth Amendment's prohibition on "'carrying out a sentence of death upon a prisoner who is insane.'" *Id.* at 934 (quoting *Ford v. Wainwright*, 477 U.S. 399, 409–10 (1986)). After concluding that the state court's failure to follow the procedures mandated by *Ford v. Wainright* resulted in an unreasonable application of clearly established law under 28 U.S.C. § 2254(d)(1), the Court held that "no deference is due" to the state court adjudication. *See id.* at 948. The Supreme Court explained that the unreasonable application of federal law permitted a plenary review of the "underlying [] claim, . . . unencumbered by the deference AEDPA

---

[2]*See* U.S. Const. art. I, § 9 cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.").

[3]That AEDPA is merely a limitation is confirmed by the numerous cases that refer to the statute as containing limitations that can be overcome by meeting the exceptions to the rule of deference set forth in the statute. *See, e.g.*, *Cullen*, 131 S. Ct. at 1400; *Medellin v. Dretke*, 544 U.S. 660, 665 (2005); *Montes v. Trombley*, 599 F.3d 490, 494 (6th Cir. 2010) (referring to "exceptions to the requirement of AEDPA deference"); *Rever v. Acevedo*, 590 F.3d 533, 537 (7th Cir. 2010).

normally requires." *Id.* This analysis has been mirrored by countless decisions in the courts of appeals.[4]

Plenary review of a federal claim when one of the exceptions to the relitigation bar of § 2254(d) is satisfied is consistent with the treatment of claims that fall outside the scope of both the relitigation bar of § 2254(d) and the procedural bar of §§ 2254(b) and (c). It is well settled that we may review *de novo* an exhausted federal claim that was not adjudicated on the merits in state court. *See Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005). Such a claim is neither precluded by the procedural bar of § 2254(b) and (c), nor the relitigation bar of § 2254(d). The same analysis dictates that we likewise review *de novo* a claim adjudicated on the merits in state court if the petitioner shows, by virtue of one of its exceptions, that the relitigation bar of § 2254(d) does not apply. *See Hennes v. Bagley*, 644 F.3d 308 (6th Cir. 2011) (applying *de novo* review to federal habeas claim, where none of the limitations in AEDPA applied); *Smith v. Bradshaw*, 591 F.3d 517, 522, 525 (6th Cir. 2010) (same).

---

[4] *See, e.g.*, *Byrd*, 645 F.3d at 1172 (opining that even if the petitioner could show an unreasonable determination of the facts under § 2254(d)(2), "we would still be left to review [the petitioner's] *Strickland* claim *de novo*"); *Breakiron v. Horn*, 642 F.3d 126, 138 (3d Cir. 2011) ("If we determine that the Pennsylvania Supreme Court's ruling was contrary to or an unreasonable application of *Strickland*, then we still must review the claim *de novo* to determine whether [the petitioner] is entitled to relief."); *Cave v. Sec'y for Dep't of Corr.*, 638 F.3d 739, 747 (11th Cir. 2011) (conducting *de novo* review of federal claim in habeas proceedings, where state court unreasonably determined the facts in light of the evidence) (collecting cases); *Williams v. Pliler*, 411 F. App'x 954, 955 (9th Cir. 2011) (reviewing *de novo* a federal claim adjudicated in state court because, as the state conceded, the state trial court applied the wrong legal standard in considering the claim); *Johnson v. Upton*, 615 F.3d 1318, 1329–30 (11th Cir. 2010) ("[W]here the petitioner makes the required § 2254(d) showing as to a state court decision, we owe no AEDPA deference to that decision and instead review the claim *de novo*."); *Maxwell v. Roe*, 628 F.3d 486, 506 (9th Cir. 2010) ("[B]ecause the state court's decision was based on an unreasonable determination of the facts under § 2254(d)(2), the AEDPA deference no longer applies. Therefore, we proceed to resolve [the] claim without the deference AEDPA otherwise requires." (internal quotation marks and citations omitted)); *Norris v. Morgan*, 622 F.3d 1276, 1285 (9th Cir. 2010); *Tucker v. Cason*, 393 F. App'x 334, 338 (6th Cir. 2010); *Miller v. Stovall*, 608 F.3d 913, 922 n.7 (6th Cir. 2010); *Holder v. Palmer*, 588 F.3d 328, 343 (6th Cir. 2009) ("When the state court issues a decision that is contrary to federal law, we review the merits of the petitioner's claim *de novo*."(citing *Dyer v. Bowlen*, 465 F.3d 280, 284 (6th Cir. 2006))); *Wilson v. Workman*, 577 F.3d 1284, 1303 (10th Cir. 2009) (conducting *de novo* review of federal claim in habeas proceedings, where state court unreasonably determined the facts in light of the evidence); *Brown v. Polk*, 135 F. App'x 618, 627 (4th Cir. 2005) ("If the state court adjudication is contrary to or an unreasonable application of 'clearly established' Supreme Court precedent, then § 2254(d) is no bar to relief, but habeas relief is not required; rather, the federal court reviews the merits of the claim under the pre-AEDPA *de novo* standard, no longer constrained by the deference required under § 2254(d)." (citing *Moody v. Polk*, 408 F.3d 141 (4th Cir. 2005))). *Accord Dretke*, 544 U.S. at 680 (O'Connor, J., dissenting) (stating that because the state court "neither asked nor answered the right question," consideration of the federal claim "must proceed *de novo*"). *Cf. Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009) (declining to reach the issue of whether a federal habeas court would review *de novo* a constitutional claim adjudicated on the merits in state court, where the state court's adjudication of the claim was unreasonable).

**II.       Analysis**

Our analysis proceeds through the lens of AEDPA and is divided into three parts. First, we discuss the constitutional standard governing Petitioner's *Batson* claim. Second, we conclude, pursuant to 28 U.S.C. § 2254(d)(2), that the Michigan Supreme Court's adjudication of Petitioner's *Batson* claim was based on the court's unreasonable factual determination that the trial judge did not discredit the prosecutor's proffered race-neutral reasons for the exercise of her peremptory strikes.  Finally, we conclude that Petitioner is being held in violation of the Fourteenth Amendment and, therefore, that relief is warranted under 28 U.S.C. §§ 2241 and 2254.

**A.       Legal Standard**

The Equal Protection Clause of the Fourteenth Amendment commands that "no state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  The Supreme Court has long interpreted the Equal Protection Clause as prohibiting a state from trying a defendant before a jury from which members of his race have been purposefully excluded. *See, e.g.*, *United States v. Harris*, 192 F.3d 580, 586 (6th Cir. 1999) (citing *Strauder v. West Virginia*, 100 U.S. 303 (1879)).  This principle was extended by the Supreme Court in *Batson v. Kentucky*, which held that a prosecutor's exercise of peremptory strikes on the basis of race violates equal protection.[5]  476 U.S. at 79.

The Supreme Court explained in *Batson* that the prohibition on racially-motivated peremptory strikes seeks to protect the rights of the litigants, the venire, and the "entire community."  *Batson*, 476 U.S. at 86–88 (stating that the "harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror . . . [by] undermin[ing] public confidence in the fairness of our system of justice"); *see also Smith v. Texas*, 311 U.S. 128, 130 (1940) ("For racial discrimination

---

[5]Although *Batson* considered only a prosecutor's unconstitutional use of peremptory strikes, *see Batson*, 476 U.S. at 89, subsequent case law has made clear that the Equal Protection Clause prohibits the exercise of racially-motivated peremptory strikes more broadly.  *See, e.g.*, *Georgia v. McCollum*, 505 U.S. 42 (1992) (criminal defendant); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991) (private litigants in civil trial).

to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government." (internal footnote omitted)).  The Supreme Court further explained in *Miller-El v. Dretke* that "[w]hen the government's choice of jurors is tainted with racial bias, that 'overt wrong . . . casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law throughout the trial.'"  545 U.S. at 235 (quoting *Powers v. Ohio*, 499 U.S. 400, 412 (1991)).

The Supreme Court has articulated a three-step analysis to be applied to an equal protection claim that purposeful discrimination occurred in jury selection.  *See Braxton*, 561 F.3d at 458 (citing *Batson*, 476 U.S. at 89).  First, the defendant must make out a prima facie case by showing that the "totality of the relevant facts gives rise to an inference of discriminatory purpose." *Johnson v. California*, 545 U.S. 162, 168 (2005) (quoting *Batson*, 476 U.S. at 94).  The defendant may satisfy his initial burden by showing that:

> he is a member of a cognizable racial group[,] that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race[,] . . . [and] that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the venire men from the petit jury on account of their race.

*Harris*, 192 F.3d at 586 (internal quotation marks and citations omitted); *see also Johnson*, 545 U.S. at 168 (holding that the defendant's initial burden is minimal).

Second, if the defendant makes out a prima facie case, the burden shifts to the prosecutor to "explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes." *Johnson*, 545 U.S. at 168 (internal quotation marks and citations omitted).  Like the defendant's initial burden, the prosecutor's burden on step two is "extremely light"; the prosecutor's proffered reason "need not be particularly persuasive, or even plausible, so long as it is neutral." *Harris*, 192 F.3d at 586 (citing *Purkett v. Elem*, 514 U.S. 765, 767–68 (1995)).

Third, if the prosecutor tenders a race-neutral reason, "the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." *Johnson*, 545 U.S. at 168 (quoting *Purkett*, 514 U.S. at 767) (alterations in original). The third step is important; *Batson* imposes upon the trial court a strict constitutional "duty to determine if the defendant has established purposeful discrimination." *Batson*, 476 U.S. at 98; *see also Johnson*, 545 U.S. at 172 ("The *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process.").

### B.    Application

#### 1.    State Court Decision was Based on an Unreasonable Determination of the Facts Under § 2254(d)(2)

In the last reasoned state court decision, the 2005 decision of the Michigan Supreme Court, the state high court determined that the state trial court did not, as a matter of fact, discredit the prosecutor's proffered race-neutral reasons for the exercise of her peremptory strikes. In granting habeas relief, the district court concluded that this finding was an unreasonable determination of the facts in light of the evidence, within the meaning of § 2254(d)(2).[6] We agree.

Based on a review of the trial transcript, "the *only* conclusion that can be fairly drawn is that the trial court believed that veniremembers Johnson and Jones were improperly excluded from the jury pool on the basis of race." *Knight,* 701 N.W.2d at 735 (Cavanagh, J., concurring in part, dissenting in part) (emphasis added). In fact, the Michigan Supreme Court agreed in 2003, but then inexplicably reversed course in 2005. *Compare Knight*, 664 N.W.2d at 213 (table) ("[The] transcript indicates that the trial judge was not satisfied with the prosecutor's race neutral reasons for peremptorily dismissing several jurors[, requiring remand] for reconsideration of whether the trial

---

[6]It is an open question whether 28 U.S.C. § 2254(e)(1), which presumes the correctness of state court factual findings absent clear and convincing evidence to the contrary, "applies in every case presenting a challenge under § 2254(d)(2)." *Wood v. Allen*, 130 S. Ct. 841, 845 (2010) (reserving decision on the relationship between §§ 2254(d)(2) and (e)(1)). We need not resolve this question, because under either section, the analysis herein would be unchanged. The factual determination at issue was as unreasonable as it was clearly erroneous, and for that reason, the precise interplay between §§ 2254(d)(2) and (e)(1) is of little moment under the circumstances of this case.

judge erred in finding a *Batson* violation."), *with Knight*, 701 N.W.2d at 729 ("The record reflects that the trial judge never explicitly found that the prosecutor violated *Batson*.  Nor can we infer such a finding on this record.").  That the same court, based on the same record, in the span of about two years, made contradictory findings of fact, does not establish unreasonableness under § 2254(d)(2) as a matter of law, but in the absence of any explanation for the about face, this sequence of events raises a red flag to possible "extreme malfunctions in the state criminal justice system[]."  *Harrington*, 131 S. Ct. at 786.

During the afternoon session on the third day of jury selection, defense counsel objected to the peremptory strike of Ms. Jones and argued that the prosecutor had struck Ms. Jones, as well as Ms. Johnson and Ms. Bonner, on the basis of their race in violation in *Batson*.  Without waiting for the trial court to rule as to whether defense counsel had made out a prima facie case under the first step of *Batson*, the prosecutor proceeded to step two by offering race-neutral reasons for her strikes.

The prosecutor's proffered reasons were as follows:  (1) Ms. Bonner had "close associations" with people who have been charged with murder; (2) Ms. Johnson had a "close relative" who was convicted of a drug crime, displayed a "reticent demeanor," and was "hesitant in her demeanor" when she indicated that she could be fair, referencing her "body language," "the tone of her voice," and "look"; and (3) Ms. Jones was a "working person" in a professional position, had a child close in age to the victim, and her child "may be different from our victim" in terms of lifestyle, causing the juror to "compare and contrast" the victim with her daughter.  (Tr. at 87.)

After the prosecutor proffered her race-neutral reasons, the trial court, as the Warden concedes, "did not 'accept' the prosecutor's reasons" as to Ms. Jones and Ms. Johnson.  (Warden Br. at 23; *see also*, *e.g.*, Tr. at 87 ("I don't accept that"); *id.* ("I do not see a reason").)  The Michigan Supreme Court itself found that "[t]he trial judge rejected the prosecutor's reasons for dismissing veniremember Johnson," and "did not accept the prosecution's reasons for dismissing veniremember Jones."  701 N.W.2d at 720.

The fact that the trial court rejected the prosecutor's race-neutral reasons for striking Ms. Johnson and Ms. Jones is unmistakable from the trial court transcript. *Cf. Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (per curiam) (holding that the state appellate court's conclusion that no *Batson* violation occurred was reasonable where the "trial court credited the prosecutor's race-neutral explanations"). The trial court stated that it "didn't see a problem with" Ms. Johnson's demeanor—which the prosecutor described as "reticent"—because, with respect to Ms. Johnson, "actually her demeanor was soft and she seemed very forthright and honest." (Tr. at 89–90.) The trial court found "[t]he same thing with Miss Jones," explaining:

> I do not see a reason other than -- I mean, it seems to me for the prosecution to say, she has a daughter the same age as the victim, that would seem to work in the prosecution's favor, just in terms of thinking in the jury selection. So I don't accept that.

(*Id.* at 88–89.) The prosecutor did not give up after the trial court rejected her proffered race-neutral reasons. Moments later, the prosecutor asserted that "[i]n terms of her reticent demeanor, I'm not sure that [Ms. Johnson] would stand up in a jury," to which the trial court responded dismissively: "Why didn't you ask her that? You didn't ask any questions of any of these jurors. You just simply are excusing them." (Tr. at 89–90.)

The trial court's rejection of the prosecutor's proffered reasons was even more explicit in subsequent statements. Responding to defense counsel's question about whether the court is "going to allow Miss Jones to be struck," the trial court responded: "If she is still here, I'm going to keep her." Defense counsel acknowledged the favorable ruling by responding, "Thank you." The trial court soon thereafter added, "I'm not satisfied with the prosecutor's response as to potential juror[s] Jones and Johnson."

The statements by the trial court unambiguously indicate that the trial court discredited the prosecutor's proffered reasons for her peremptory strikes, thereby resolving the *Batson* inquiry against the prosecutor. Although the trial court did not expressly state that the prosecutor engaged in discrimination, the trial court's explicit rejection of the prosecutor's proffered race-neutral rationale necessarily constitutes such

a finding.  *See, e.g.*, *Dretke*, 545 U.S. at 231 (granting habeas relief on a *Batson* claim, where the state court found no discrimination, but each of the race-neutral reasons proffered by the prosecution were deficient).

Despite the trial court's unambiguous rejection of the prosecutor's proffered race-neutral reasons, the Michigan Supreme Court found that "the trial judge neither explicitly nor implicitly" found a *Batson* violation.  *Knight*, 701 N.W.2d at 731.  To reach its conclusion, the state supreme court offers two primary rationales, each of which is unreasonable in light of the record.  First, the court characterizes the trial judge's comments as "initial expression[s] of dissatisfaction."  *Id.* at 730.  But nowhere in the record does the trial judge retract her rejection of the prosecutor's race-neutral reasons.

Second, the court characterizes the trial court's statements as "impl[ying] that [the court] would have kept [the challenged jurors] on the jury to ensure that the number of African-American jurors remained proportionate to the number of Caucasian jurors," rather than implying the prosecutor engaged in discrimination.  *Id.* at 731.  It is true that the trial court appears to have believed, erroneously, that *Batson* demands racial proportionality.  But this erroneous belief cannot explain the court's express and unambiguous rejection of the prosecutor's race-neutral reasons as to Ms. Johnson and Miss Jones.  If the trial court's rejection of the prosecutor's proffered race-neutral reasons had been motivated solely by a desire to ensure racial balance, it is illogical that the trial court would not have also rejected the proffered reasons as to Ms. Bonner, an African-American woman.  It is also illogical that the court would have stated, as it did, that the court should have "especially" kept Ms. Jones on the jury when discussing both her and Ms. Johnson.  (Tr. at 95-96.)

Although the trial judge erroneously believed that *Batson* demands racial balance and that *Batson* violations may be "cured" by reference to the ultimate racial composition of the panel, no fair and reasonable reading of the trial transcript suggests that this erroneous belief would explain the trial court's rejection of the specific reasons proffered by the prosecutor as to Ms. Johnson and Ms. Jones.  *See Knight*, 701 N.W.2d at 736 (Cavanagh, J., concurring in part, dissenting in part) ("[R]egardless of the trial

court's main goal . . . the record clearly demonstrates that the trial court along the way also found that purposeful discrimination occurred in violation of *Batson*.").

No fair and reasonable reading of the record would permit the Michigan Supreme Court to find, as a matter of fact, that the trial judge did not discredit the prosecutor's proffered race-neutral reasons. Nothing in the record even suggests as much. The trial judge appears to have misunderstood the nature of the court's duty under *Batson*, but, regardless of the trial judge's subjective understanding or motivation, the record makes clear that the trial judge rejected the prosecutor's proffered race-neutral reasons for the exclusion of either or both Ms. Jones and Ms. Johnson. As Petitioner states, "[t]here is no other objectively reasonable way around it." (Pet'r Br. at 34.)

Accordingly, the Michigan Supreme Court unreasonably determined, in light of the record, that the trial court did not discredit the prosecutor's proffered race-neutral reasons for striking the challenged jurors, within the meaning of § 2254(d)(2). This unreasonable determination was the basis of the court's adjudication of Petitioner's *Batson* claim, and therefore the relitigation bar of § 2254(d) poses no obstacle to this Court's review. *See Byrd*, 645 F.3d at 1172.

### 2. Equal Protection Violation

Having determined that AEDPA's relitigation bar does not preclude consideration of Petitioner's claim pursuant to § 2254(d), the next question is whether Petitioner can prevail on his underlying constitutional claim. *See Bradshaw*, 591 F.3d at 522. It is not enough that Petitioner show an unreasonable determination of fact under § 2254(d)(2)—doing so only removes AEDPA's litigation bar. Once the bar is removed, Petitioner must show that he is being held in violation of federal law by identifying, and prevailing on, a federal claim. *See Corcoran*, 131 S. Ct. at 16 (reversing grant of habeas under § 2254(d)(2), where the court of appeals did not identify an error of federal law upon which to grant relief); *see also* 18 U.S.C. §§ 2241, 2254(a); *Swarthout v. Cooke*, 131 S. Ct. 859, 861 (2011); *Matthews v. Parker*, 651 F.3d 489, 522 (6th Cir. 2011).

In this case, Petitioner alleges a violation of the Equal Protection Clause of the Fourteenth Amendment as interpreted by *Batson v. Kentucky*. Although Petitioner's claim was adjudicated on the merits in state court, Petitioner has satisfied his burden to show that the state court adjudication was premised on an unreasonable determination of the facts, within the meaning of 28 U.S.C. § 2254(d)(2). Because the state court decision was premised on a plainly erroneous reading of the record, deference is not given to that decision, and the Court may review the claim *de novo*.[7] Upon review, we conclude that Petitioner has shown a violation of his right to equal protection under the Fourteenth Amendment.

As an initial matter, the trial court failed to satisfy its constitutional duty under *Batson*. The trial court did not acknowledge the applicable legal standard, nor did it even attempt to apply the tripartite burden-shifting framework of *Batson*. This error was recognized by the Michigan Supreme Court, which noted the trial judge's "failure to rigorously follow the *Batson* procedures and, more importantly, to clearly articulate her findings and conclusions on the record." *Knight*, 701 N.W.2d at 730. Based on a review of the record, it appears that the trial court was unaware of the proper manner in which to resolve a *Batson* objection. The trial court breached its constitutional duty at step three of *Batson* "to determine if the defendant has established purposeful discrimination." *Braxton*, 561 F.3d at 461 (quoting *Batson*, 476 U.S. at 98); *see also United States v. Torres-Ramos*, 536 F.3d 542, 559 (6th Cir. 2008).

Compounding these procedural errors, the trial court apparently believed that any *Batson* violation could be "cured." The Michigan Supreme Court summarized the problem:

> [T]he trial judge's focus, as her comments reflect, was to ensure that the racial composition of the jury remained proportionate. . . . Here, the jury pool, by chance, contained a greater number of Caucasians than African-Americans. The trial judge was preoccupied with this fact. Her

---

[7]Reviewing *de novo* in this case makes sense; in light of the Michigan Supreme Court's reliance on erroneous facts, "we do not know what [that] court would have decided" had it not unreasonably determined the facts in light of the record. *Maxwell v. Row*, 628 F.3d 486, 506 (9th Cir. 2010) (internal citation and quotation marks omitted).

> *Batson* analysis seemed to be infused with and confused by the erroneous belief that *Batson* is violated if the challenge resulted in too few minority jurors. . . . The trial judge failed to recognize that a defendant is not entitled to a jury of a particular racial composition as long as no racial group is systematically and intentionally excluded.

*Knight*, 701 N.W.2d at 730. As we have repeatedly explained, and lament that we must explain again: "Where purposeful discrimination has occurred, to conclude that the subsequent selection of an African-American juror can somehow purge the taint of a prosecutor's impermissible use of a peremptory strike to exclude a venire member on the basis of race confounds the central teachings of *Batson*." *Lancaster v. Adams*, 324 F.3d 423, 434 (6th Cir. 2003). *Batson* does not guarantee a trial by a jury composed in whole or in part of individuals of a certain race, but instead guarantees the "'right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria.'" *Id.* (quoting *Batson*, 476 U.S. at 85–86).

Despite the state trial court's failure to adhere to the constitutionally required inquiry, and its egregious misunderstanding of the law, it is clear that a *Batson* violation occurred. Appellate review in this case is complicated by the trial judge's failure to adhere to the constitutional framework, but the context of the proceedings permits meaningful review under the proper standard.

At step one, Petitioner met his burden because the prosecutor proceeded to step two of *Batson* before the trial court made a ruling at step one. As a result, "the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Braxton*, 561 F.3d at 461 (quoting *Hernandez v. New York*, 500 U.S. 352, 359 (1991) (plurality)) (internal quotation marks omitted). At step two, the prosecutor met her burden to proffer race-neutral reasons for the exercise of her peremptory strikes. Although the prosecutor's proffered reasons were flimsy, the reasons were race neutral on their face, and thus the *Batson* inquiry proceeds to step three. *See Johnson*, 545 U.S. at 171 ("[E]ven if the State produces only a frivolous or utterly nonsensical justification for its strike, the case does not end—it merely proceeds to step three.").

The *Batson* inquiry in this case turned on step three, namely whether the trial court accepted or rejected the prosecutor's proffered race-neutral reasons. *See Cockrell*, 537 U.S. at 339 (stating that "the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed"). As discussed above, the record is clear that the trial court rejected the prosecutor's reasons for striking Ms. Johnson and Ms. Jones. Without repeating our entire prior discussion, the record reveals that the trial court considered the prosecutor's proffered explanations and rejected them, stating, among other things, "I don't accept that," and "I'm not satisfied with the prosecutor's response as to potential juror[s] Jones and Johnson."

The trial court may not have understood the nature of the inquiry it made. But this is of little, if any, consequence because the trial court's clear and unambiguous rejection of the prosecutor's race-neutral reasons, after an "on-the-record-analysis" of the proffered reasons, *Braxton*, 561 F.3d at 461, amounts to a finding at step three that the prosecutor engaged in invidious discrimination. This finding is accorded high deference, *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) ("On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous."), and based on the record, does not appear to be clearly erroneous or even erroneous at all.

The trial record "reveals that the trial court became suspicious of the prosecutor's method of exercising peremptory challenges." *Knight*, 701 N.W.2d at 737 (Cavanagh, J., concurring in part, dissenting in part). In considering Petitioner's *Batson* challenge to the exclusion of venire members Johnson and Jones—and after observing the proceedings and listening to the proffered race-neutral reasons of the prosecutor—the trial court concluded that the prosecutor excluded Ms. Jones and Ms. Johnson because of their race. With regard to Ms. Jones, the trial court dismissed the prosecutor's proffered reasons for her exclusion—that she was a professional woman with a child close in age to the victim—as equally applicable to white women who were not challenged. And with regard to Ms. Johnson, the trial court rejected the prosecutor's stated concerns about her demeanor, remarking that the trial court noticed no problem.

*See Dretke*, 545 U.S. at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step."). Additionally, although not dispositive, the prosecutor's peremptory challenges during the afternoon session were largely against African-American jurors.

In light of the high degree of deference given to the trial court's credibility assessment, nothing in the record suggests that the trial court clearly erred in finding purposeful discrimination in the striking of veniremembers Johnson and Jones. We therefore conclude, as the trial judge did, that a *Batson* violation occurred during jury selection.

### C.    Remedy

Having concluded that a *Batson* violation occurred at trial, the only issue that remains is the appropriate remedy. The two primary remedies for a *Batson* violation available to a trial court are first, disallowing the improper strike, and second, discharging the entire venire and starting anew. *See, e.g., United States v. Angel*, 355 F.3d 462, 481, 481 n.3 (6th Cir. 2004) (citing *Batson*, 476 U.S. at 99 n.24). In this case, the first remedy was unavailable to the trial court because the challenged jurors left the courthouse. And the trial court did not employ the second remedy, presumably because the court found that any *Batson* violation had been "cured."

In the absence of any remedial action undertaken by the trial court, the existence of an unmitigated *Batson* violation requires that the conviction be vacated. *See Batson*, 476 U.S. at 100 (holding that "[i]f the trial court decides that the facts establish, prima facie, purposeful discrimination and the prosecutor does not come forward with a neutral explanation for his action, our precedents require that petitioner's conviction be reversed"); *United States v. Simon*, No. 09-4194, 2011 WL 1778200, at *3 (citing *United States v. McFerron*, 163 F.3d 952, 955–56 (6th Cir. 1998)). Because we are sitting as a habeas court, the proper disposition of this matter shall consist of the issuance of a conditional writ of habeas that orders the state to retry Petitioner within 180 days, or release him from custody.

**CONCLUSION**

For the reasons stated above, the judgment of the district court is **AFFIRMED**, and a conditional writ of habeas corpus is hereby issued, directing the State of Michigan to retry Petitioner within 180 days, or release him from custody.