ROGERS, Circuit Judge,
dissenting.
I join all but parts III. B. and VI. B. 1. of the majority’s opinion.
First, the Tennessee Supreme Court was not unreasonable in finding insufficient prejudice from the prosecutor’s clearly improper remarks. Equating the defendant with the devil incarnate, Susan Smith, and Jeffery Dahmer was clearly improper. But the Tennessee Supreme Court could reasonably find that this extreme and belabored metaphor did not cause the jury to impose the death sentence, in the face of the extraordinarily brutal facts of this *490 case. The Tennessee Supreme Court found that:
The victim, Rosemary Smith, was placed in a closet, first enduring the mental anguish of her husband’s murder in the next room. She then was raped twice, ridiculed, suffered through a bungled attempt at strangulation and strangled to death with a tourniquet device placed around her neck that caused massive damage to her throat and larynx. There was evidence that the victim struggled to save herself while still alive and conscious by attempting to release the pressure which was applied to her neck. After the blood supply was finally cut off at the end of the struggle, she may have lost consciousness in thirty seconds but remained alive for three to six minutes.
State v. Cauthern, 967 S.W.2d 726, 732 (Tenn.1998). Although the Tennessee Supreme Court’s reasoning was brief with regard to the prejudice caused by the prosecutor’s remarks, its central reasoning was clear: “the misconduct must be viewed together with the overall record and the overwhelming strength of the State’s ease. The evidence supported the aggravating factor relied on by the State, as well as a finding that this factor outweighed the evidence of mitigating factors.” Id. at 737-38.
This analysis is a reasonable application of Supreme Court law. It mirrors the reasoning used by the Court in Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). As the Supreme Court there explained, “it is not enough that the prosecutors’ remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors’ comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.” Id. at 181, 106 S.Ct. 2464 (internal quotation marks omitted). In this case, as in Dar-den, “[t]he weight of the evidence against the petitioner was heavy; the overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges reduce the likelihood that the jury’s decision was influenced by the closing argument.” Id. at 182, 106 S.Ct. 2464 (internal quotation marks and citation omitted). Considering the substantial evidence of the grisly manner in which Rosemary was killed, it was reasonable to conclude that the prosecutor’s remarks did not rise to the level of a due process violation because the jury would not have needed to rely on the prosecutor’s remarks to find the aggravating factor.
The Tennessee Supreme Court also noted that the prosecutor’s closing argument appeared to be a response to defense counsel’s suggestion that a civilized society should not impose the death penalty and a rebuttal of Cauthern’s evidence of his rehabilitative potential. Cauthern, 967 S.W.2d at 737-38. The concept of invited response was relied upon by the Supreme ■Court in Darden. There the Court explained that “the idea of ‘invited response’ is used not to excuse improper comments, but to determine the effect on the trial as a whole.” Darden, 477 U.S. at 182, 106 S.Ct. 2464. Whether the response is invited is relevant to the analysis because a prosecutor’s improper remarks are less likely to affect the fairness of the trial if their purpose was merely to “right the scale” in response to a defendant’s arguments. United States v. Young, 470 U.S. 1, 12-13, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). Although the prosecutor’s remarks went well beyond what was necessary to respond to the defense, it was still reasonable for the state court to conclude that the prosecutor’s remarks were less likely to cause prejudice in the context of the defense’s commentary on the propriety of the death penalty in a civilized society.
*491 The reasonableness of the state court’s decision is buttressed by the fact that just last year the Supreme Court reminded us that “the Darden standard is a very general one, leaving courts ‘more leeway ... in reaching outcomes in case-by-case determinations.’ ” Parker v. Matthews, — U.S. -, 132 S.Ct. 2148, 2155, 183 L.Ed.2d 32 (2012) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)). The less specific a rule is, the more room there is for disagreement over how the rule ought to apply, and the more likely a given application is to be reasonable. Yarborough, 541 U.S. at 664, 124 S.Ct. 2140.. The generality of the Darden standard makes it all the more difficult to find that the Tennessee Supreme Court’s application of federal law was unreasonable.
Moreover, even if the Tennessee high court’s analysis was so cryptic and unpersuasive as to be unreasonable, that would not necessarily mean that Cauthern succeeds on this appeal, but rather that we would decide de novo whether there was a constitutional violation. See Rice v. White, 660 F.3d 242, 257 (6th Cir.2011). Under an independent application of the relevant standard from Brecht v. Abrahamson, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the error was harmless. First, the factors discussed above — the significant evidence of torture and the fact that defense counsel invited the prosecutor’s response — weigh in favor of a finding of no injurious effect on the verdict. Next, almost immediately after the prosecutor’s remarks, the judge instructed the jury that “[statements, arguments and remarks of the lawyers ... [are] not evidence” and later that the jury should make its decision based on the facts and not “sympathy or prejudice.” Even if generic, such an instruction is still relevant in a harmless error review. The fact that the instructions were given is a factor that should be considered when evaluating the effect of an error on the verdict. The significant evidence before the jury along with the “important presumption that jurors followed the trial court’s instructions,” United States v. Guzman, 450 F.3d 627, 629 (6th Cir.2006), provides a rational explanation for the sentence: the jury followed its instructions and sentenced Cauthern based on the evidence before it — not because of the prosecutor’s egregious remarks.
The presumption that the jury followed the instructions it was given is bolstered by the fact that it sentenced Cauthern to death for Rosemary’s death but not for Patrick’s. The evidence before the jury much more clearly established that Rosemary’s death was heinous, atrocious, or cruel. Rosemary heard her husband being killed, was raped twice, suffered through a botched strangling, and finally was killed in a particularly gruesome manner. Patrick’s death, horrible as it was, did not have the same indicia of torture as his wife’s. The jury’s decision to impose different punishments does not definitively answer whether the remarks affected the verdict, but the fact that the jury behaved rationally enough to distinguish between the circumstances surrounding the murders is another factor that indicates the jury was weighing the evidence and not the prosecutor’s improper remarks when it returned the death sentence. Together, these facts indicate that the prosecutor’s comments did not have a substantial and injurious effect on the verdict.
Second, the Tennessee Court of Criminal Appeals was not unreasonable in finding insufficient prejudice from defense counsel’s failure to interview Cauthern’s step-siblings. Prejudice, the second prong of the Strickland analysis, is shown when “there is a reasonable probability that, but for counsel’s unprofessional errors, the re- *492 suit of the proceeding would have been different.” Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As the state court explained, if the step-siblings had testified, their testimony would not have been particularly helpful to Cauthern. Each of his step-siblings would have testified that they had been abused by Dagmar (Cauthern’s grandmother), but that Cauthern was favored as the “golden child” of the family. Cauthern v. State, 145 S.W.3d 571, 584 (Tenn.Crim.App.2004) (finding that Melinda would have testified that Cauthern was “‘the apple of [Dagmar’s] eye’”); id. at 585 (finding that Bud would have testified that Cauthern was initially the favorite child but would be subject to unpredictable abuse when he became older); id. (finding that Eveann would have testified that she and Cauthern were “golden children”). Based on these findings, the Court of Criminal Appeals concluded that “[e]ven though the petitioner’s step-siblings undoubtedly endured abusive, isolated childhoods, it is by no means obvious from the proof that the petitioner’s childhood rivaled theirs.” Id. at 609. In fact, testimony from the step-siblings could well have hurt Cauthern because the jury could have concluded that Cauthern’s step-siblings “do not manifest obvious antisocial traits or violent tendencies” despite having been subject to greater abuse at the hands of Dagmar. Id. Concluding that there was no reasonable probability that the evidence of Cauthern’s childhood would have changed the jury’s imposition of the death penalty was not an unreasonable application of Strickland.
To be sure, the majority articulates reasonable bases for disagreeing with the Tennessee Supreme Court and the Court of Criminal Appeals on the two prejudice issues. But as the Supreme Court has repeatedly explained:
an unreasonable application of federal law is different from an incorrect application of federal law. Indeed, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable. This distinction creates a substantially higher threshold for obtaining relief than de novo review. AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt.
Renico v. Lett, 559 U.S. 766, 773, 130 S.Ct. 1855, 176 L.Ed.2d 678 (2010) (citations and internal quotation marks omitted).
In a meticulous 168-page opinion, District Judge Trauger thoughtfully and carefully disposed of multiple arguments presented by petitioner’s counsel. I would affirm the judgment of the district court denying the habeas writ.