NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0952n.06

Nos. 12-2571/2573

FILED
**Dec 31, 2014**
DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

JAMES DRAIN,

      Petitioner-Appellee/Cross-
      Appellant,

v.

JEFFREY WOODS,

      Respondent-Appellant/Cross-
      Appellee.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

BEFORE:    DAUGHTREY, CLAY, and STRANCH, Circuit Judges.

**CLAY, Circuit Judge.** Petitioner-Appellee Cross-Appellant James Drain ("Drain" or "Petitioner") was convicted of first-degree murder, felon in possession of a firearm, and felony firearm. After the Michigan Court of Appeals affirmed the convictions and the Michigan Supreme Court denied review, Petitioner moved for relief from judgment. The Michigan trial court granted Drain's motion on a number of grounds, including that the trial court failed to remedy the prosecutor's violations of *Batson v. Kentucky*, 476 U.S. 79 (1986), and that Petitioner's counsel was ineffective for failing to object to either the *Batson* violations or the court's inadequate remedy for those violations during *voir dire*. The Michigan Court of Appeals reversed, and after the Michigan Supreme Court denied review, Petitioner filed a petition for writ of habeas corpus, asserting a number of claims for relief. The district court issued an order

conditionally granting habeas relief based on Petitioner's *Batson* and related ineffective assistance of counsel claims.

Respondent-Appellant Cross-Appellee, the State, appeals the district court's grant of habeas relief on those two grounds, and Petitioner cross-appeals the district court's determinations that his other claims were procedurally defaulted or lacked merit.

Because we believe the Michigan Court of Appeals applied law contrary to Supreme Court precedent and the trial court allowed Petitioner to be tried by a jury tainted by uncured *Batson* violations, we **AFFIRM** the district court's decision conditionally granting habeas relief.[1]

## I.

## BACKGROUND

The *Batson* issue in Petitioner's case arises in an unusual posture for appellate and habeas review: the trial court in fact found that the prosecutor violated *Batson*. However, as every judge to reach the issue in this case has determined, the court then entirely failed to cure the violation and allowed Petitioner to be convicted by a jury selected in violation of *Batson*. The trial court raised the *Batson* issue *sua sponte* after the prosecutor used seven of her peremptory strikes to eliminate minority venire persons from the jury. The prosecutor then offered race-neutral reasons for each of the strikes. The trial court considered and rejected the prosecutor's explanations, announcing that it found the prosecutor had excluded black jurors based on their race. At no point did defense counsel join in the court's *Batson* challenge or offer argument against the prosecutor's alleged race-neutral reasons. Despite finding that the prosecutor's

---

[1] Because we conclude that habeas relief is appropriate for Petitioner's *Batson* and related ineffective assistance of counsel claims, we do not reach the merits of Petitioner's other asserted grounds for habeas relief.

strikes were racially motivated, the trial court failed to cure the *Batson* violations that had already occurred, requiring only that the prosecutor approach the court for permission before striking any more African American or minority venire persons. Petitioner's counsel remained silent, failing to raise any objection to this plainly inadequate remedy.

Petitioner proceeded to trial and was convicted of first-degree murder, felon in possession of a firearm, and felony firearm. He was accused of shooting Angela Jones at close range as Jones sat in her car. The prosecution's case rested heavily on an eyewitness, Collandria Baker, who testified that she saw Petitioner shoot Jones as she, Baker, was on her way to buy drugs late that night. No other physical evidence or eyewitness testimony connected Petitioner to the crime.

## A.    *Voir dire*

On the second day of *voir dire*, the trial court *sua sponte* challenged the prosecutor's use of peremptory challenges after noting for the record that seven of her nine peremptory strikes eliminated African American prospective jurors.[2] Drain's trial counsel did not object to the prosecutor's use of peremptory strikes. Once the trial court raised this issue and warned the prosecutor that further challenges of African American venire persons would require the trial court's permission, the prosecutor suggested that only defense counsel could lodge a *Batson* challenge. The court rejected that argument, stating, "If you read *Batson*, oh, no, courts can definitely challenge it." (R. 8-4, Tr. Transcript, PageID# 630.) Defense counsel did not join the colloquy at that point. The prosecutor then volunteered to provide explanations for her strikes:

> **Ms. Jeffers:** Ms. Jeffers was asleep, judge. When we – that's one of the reasons that I excused her. I suspected that she had been sleeping. But as I watched, it

---

[2] Six African American women and one African American man were eliminated through the prosecutor's use of peremptory strikes.

looked like her eyes would open and they would close. When we called her name, if the Court recalls, the other jurors had to wake her up to have her leave. I think if she is sleeping during voir dire, she is likely to miss the testimony during the trial. So that's why I excused her. (*Id.* at 630.)

**Ms. James:** There was something that she said early on in the voir dire that made me question whether she was gonna listen to the testimony of a person that's a drug user and second police officers, and that is my case, as objectively as she might a plumber or carpenter or whatever. So I had some misgivings about that. (*Id.* at 631.)

**Ms. Dewberry:** Ms. Dewberry in response to [defense counsel's] statements indicated that she . . . believed a person who is a drug user always has their senses and their judgment affected, that she did not believe such a person would be credible. Again, that's my case. That's a key witness in my case. (*Id.*)

**Ms. Gutierriez:** Frankly it was just the fact that Ms. Gutierreiz was very, very I think, much younger than any of the other persons. And in my experience, younger jurors don't always bring as much life experience to a case as they would like. (*Id.* at 631-32.)

**Ms. Trotter:** Ms. Trotter, frankly, in hindsight, I wish I hadn't [struck her]. My misgiving about her was, and that's the one in seat 12, but the misgiving about her was during the initial questioning when you asked her about complying with the burden of proof and applying the appropriate standard, what slipped out of her lips was something about, oh, yes, I'd weigh for a shadow of − I mean a reasonable doubt.

And I believe that someone who starts with a perception that the case has to be proven beyond a shadow of a doubt is gonna hold me to a higher standard. (*Id.* at 632.)

**Ms. Standfield:** Oh, that was the young girl − I believe the one that sat on the end. That was the young girl who indicated she had friends or relatives who had some narcotics use. That again it's the youth factor primarily with her. That she didn't believe or wouldn't believe anything that a person that was a drug user would have to say. She didn't believe they could accurately relate things that they had seen and again that's my case. (*Id.* at 633.)

The court did not require the prosecutor to provide her reasons for seeking to strike the seventh African American juror, Mr. Scurry, because the prosecutor had sought to remove him

for cause. The prosecutor additionally sought to present her reasons for striking two white jurors, but the court declined to allow it.

The court then rejected the prosecutor's stated reasons. As to the prosecutor's statements that she struck Ms. Gutierriez and Ms. Standfield because of their age, the court observed that white juror and full time student Paul Reger "is obviously the youngest juror on here" and yet was not struck by the prosecutor. (*Id.* at 634.) As to the concern about whether the excluded jurors would believe the testimony of a drug user, the court remarked, "[A]t least half of the white jurors on this jury have said the very same thing." (*Id.* at 633.) The court continued, "[T]hey have said exactly the same thing that they believe that drugs affect the perceptions of people." (*Id.*) The court listed four white women who were eventually empaneled on the jury whom she believed to have made similar statements: "Certainly Ms. Lois Egner, Juror 13, has said that. Lulu Richards said that. Sue Deneau said that and Sue Hallam. They all said that. And I think there are others." (*Id.*) After twice instructing the prosecutor not to interrupt, the court stated, "[I]t's clear to me that you have consistently excluded black jurors based on their race." (*Id.* at 634.)

The court's list of white jurors who expressed concern about drug use affecting a witness's perception is not borne out by the record. Ms. Richards stated that she would not "automatically" reject the testimony of a drug user, but that she might be suspicious.[3] Ms. Egner was only asked if she would "automatically dismiss" a drug user's testimony (to which she answered "I don't believe so").[4] Neither Ms. Deneau nor Ms. Hallam were questioned on the

---

[3] "[Prosecutor]: Would you, Miss Richards, automatically reject what this person has to say simply because she is a drug user? [Ms. Richards]: Not automatically, no. [Prosecutor]: You would be a little suspicious? [Ms. Richards]: I might be." (R. 8-3 at 383.)

[4] "[Prosecutor]: Now you know that one of the witnesses in this case you're gonna learn has a history of drug use. Would any of the four of you automatically dismiss what the witness

issue. The court was correct, however, that a significant number of the white jurors remaining on the jury had expressed some concern about drug users' credibility or perceptions, as will be discussed in more detail below.

After announcing a finding that the prosecutor "consistently excluded black jurors based on their race," (*Id.* at 634) the court took no action to undo the effects of the prosecutor's racially-motivated strikes on the composition of the jury, such as recalling the improperly dismissed jurors or dismissing the venire and starting anew. Defense counsel did not object to the court's failure to remedy the *Batson* violation. The parties finished the *voir dire* examination of the last person in the venire, a black man named Arthur Ball. The court excused Mr. Ball after the prosecutor challenged him for cause. The court then announced that the trial would proceed with thirteen jurors still present rather than the usual fourteen. The empaneled jury included four black jurors, one of whom was an alternate.

## B.     Post-Trial Procedure

The jury found Petitioner guilty of first-degree murder, felon in possession of a firearm, and felony firearm. Before he was sentenced, Drain moved for a new trial, claiming that new evidence became available indicating that the State's primary witness, Baker, lied to the court during her trial testimony. The trial judge held an evidentiary hearing on the matter and concluded that Petitioner could not establish that Baker actually recanted her prior testimony, that her testimony was false, or that the prosecutor was aware of this falsity. The trial judge denied the motion and sentenced Petitioner to life without the possibility of parole for the first degree murder conviction, two years for the felony firearm conviction, and time served for the felon in possession conviction.

---

has to say simply because she has a drug history? … Ms. Egner? [Ms. Egner]: I don't believe so." (R. 8-4 at 462.)

Petitioner then filed a direct appeal with the Michigan Court of Appeals, raising a *Batson* claim along with a number of other claims. On June 29, 2004, the Michigan Court of Appeals affirmed Petitioner's convictions in a *per curiam* opinion without ruling on the merits of the *Batson* claim. Instead, the Michigan Court of Appeals concluded that Petitioner had waived that claim because his defense counsel failed to object to the peremptory strikes during his trial. *See People v. Drain*, No. 246014, 2004 WL 1459314 (Mich. Ct. App. June 29, 2004). Petitioner filed a motion for reconsideration raising additional ineffective assistance of counsel claims. Petitioner's motion was denied on August 11, 2004. Petitioner filed an application for leave to appeal the judgment, which was denied by the Michigan Supreme Court on February 28, 2005. *See People v. Drain*, 472 Mich. 867 (2005).

After this denial, Petitioner filed a motion for relief from judgment on May 16, 2006, asserting, *inter alia*, that (1) trial counsel was ineffective for failing to object to the manner in which the trial court handled the *Batson* violation as well as for other failures during trial; (2) appellate counsel was ineffective for failing to raise a claim on direct appeal about trial counsel's ineffectiveness in conjunction with the *Batson* violation; and (3) there was good cause for Petitioner's failure to raise certain claims on direct appeal and actual prejudice caused by the irregularities in his trial.

The trial court held oral arguments on this motion and issued an opinion granting relief on December 13, 2006. As relevant here, the court held that Petitioner's trial counsel was ineffective for failing to object to the *Batson* violation and to the trial court's procedures for handling the *Batson* violation. The trial court also found for Petitioner on three of his other grounds for appeal.

The state appealed this decision. The Michigan Court of Appeals reversed. *People v. Drain*, No. 275327, 2009 WL 127663 (Mich. Ct. App. Jan. 20, 2009). In a lengthy dissent, Judge Gleicher argued that the trial court's finding of a *Batson* violation should be upheld, but that "the trial court erred when it constructed a remedy lacking any cognizable legal basis." *Id.* at *11. The Michigan Supreme Court denied Petitioner leave to appeal on January 22, 2010, and then denied his motion for reconsideration on March 29, 2010.

Drain filed a petition for writ of habeas corpus on March 31, 2010, pursuant to 28 U.S.C. § 2254. The petition again raises the *Batson* claim and related claims for ineffective assistance of trial and appellate counsel, together with a number of other claims. While the State asserted in its answer that several of Petitioner's ineffective assistance of counsel claims were procedurally defaulted, the State did not make a procedural default argument with regard to Petitioner's *Batson* claims.

In a lengthy opinion issued on November 2, 2012, the district court granted habeas relief based on Petitioner's *Batson* and related ineffective assistance of counsel claims. The district court denied relief on the remainder of Petitioner's claims. This appeal followed.

## II.

## DISCUSSION

### A.    Standard and Scope of Review

When reviewing a district court's decision regarding a habeas petition, this Court applies *de novo* review to the court's conclusions of law and clear error review to its factual findings. *Hanna v. Ishee*, 694 F.3d 596, 605 (6th Cir. 2012). A district court's findings of fact are clearly erroneous when "we are left with the definite and firm conviction that a mistake has been

committed." *United States v. Canipe*, 569 F.3d 597, 600 (6th Cir. 2009) (citing *United States v. Ellis*, 497 F.3d 606, 611 (6th Cir. 2007)).

The Antiterrorism and Effective Death Penalty Act (AEDPA) restricts the ability of federal courts to grant habeas relief to a state prisoner whose claim has already been "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d); *Johnson v. Williams*, 133 S.Ct. 1088, 1091 (2013). Under § 2254(d), a federal court may not grant a writ of habeas corpus with respect to any claim adjudicated on the merits in state court unless the state adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). A state court's decision is "contrary to" clearly established law under § 2254(d)(1) if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). An unreasonable application of clearly established law occurs when "the state court identified the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. Courts also find under § 2254(d)(1) that a state court's decision is contrary to clearly established law "if the state court applie[d] a rule that contradicts the governing law set forth in [Supreme Court] cases." *Williams*, 529 U.S. at 405. *See also Lafler v. Cooper*, 132 S. Ct. 1376, 1390 (2012); *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003); *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Davis v. Lafler*, 658 F.3d 525, 540 (6th Cir. 2011). Clearly established law is the law that existed at the time of

the relevant state-court decision, not the date of finality of conviction. *See Greene v. Fisher*, 132 S. Ct. 38, 44 (2011); *Lovins v. Parker*, 712 F.3d 283, 293 (6th Cir. 2013). Also, clearly established law "signifies the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *Howes v. Fields*, 132 S. Ct. 1181, 1187 (2012) (internal quotation marks omitted).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be 'objectively unreasonable.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Williams*, 529 U.S. at 409, 411) (internal citation and quotation marks omitted). Therefore, in evaluating a habeas claim under AEDPA, a federal court must "determine what arguments or theories supported, or could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 786 (2001)).

A further limitation on federal habeas review is the independent and adequate state-law ground doctrine. Because federal courts have "no power to review a state law determination that is sufficient to support the judgment," federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). The independent and adequate state-law ground doctrine "applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Id*. at 729–30. This Court has explained that "procedural default results where three elements are satisfied: (1) the petitioner failed to comply with a state procedural rule that is applicable to the petitioner's claim

(2) the state courts actually enforced the procedural rule in the petitioner's case; and (3) the procedural forfeiture is an 'adequate and independent' state ground foreclosing review of a federal constitutional claim." *Willis v. Smith*, 351 F.3d 741, 744 (6th Cir. 2003) (quoting *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)). To excuse a procedural default, a petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750; *see also Wainwright v. Sykes*, 433 U.S. 72 (1977).

Finally, if a claim was *not* "adjudicated on the merits in State court proceedings," pursuant to § 2254(d), then this Court applies pre-AEDPA standards, reviewing legal issues *de novo*. *Johnson v. Williams*, 133 S. Ct. 1088, 1097 (2013) ("The language of 28 U.S.C. § 2254(d) makes it clear that this provision applies only when a federal claim was adjudicated *on the merits* in State court."); *Rayner v. Mills*, 685 F.3d 631, 637-39 (6th Cir. 2012).

**B.** **_Batson_ Violation**

The Michigan Court of Appeals first reviewed Petitioner's *Batson* claim on direct appeal, determining that Petitioner had waived that claim because his defense counsel failed to object to the prosecutor's use of peremptory strikes at trial. Therefore, the court did not address the merits of the claim at that time. Following the trial court's grant of Petitioner's motion for post-conviction relief on his *Batson* claim, the Michigan Court of Appeals had to determine whether Petitioner was eligible for relief under M.C.R. § 6.500 *et seq.* Under M.C.R. § 6.508(D)(3), "relief is unavailable to a defendant who 'alleges grounds for relief . . . which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter.'" *People v. Drain*, No. 275327, 2009 WL 127663, at *1 (Mich. Ct. App. Jan. 20, 2009) (per

curiam) (quoting M.C.R. § 6.508(D)(3)). A defendant may avoid this bar, however, if he can demonstrate good cause for failing to raise the claim earlier and that actual prejudice would result. Petitioner argued that ineffective assistance of his trial counsel established good cause to excuse the default, and actual prejudice existed. Therefore, the Michigan Court of Appeals had to determine whether Petitioner's counsel was ineffective for failing to raise the *Batson* challenge during *voir dire*. In making this determination, the court reviewed Petitioner's claim on the merits, ultimately concluding that Petitioner could not establish a *prima facie* showing of purposeful discrimination, that the trial court impermissibly combined steps two and three of the *Batson* inquiry, that the trial court improperly challenged the strikes collectively rather than on a case-by-case basis, and that the evaluation of the prosecutor's explanation for the strikes was unsupported by the record. *Id.* at *1-4. Therefore, the court concluded that no *Batson* violation occurred at Petitioner's trial and that Petitioner's trial counsel could not be found ineffective for failing to raise a meritless or futile objection. *Id.* at *4.

### 1. Standard of Review

Although it appears that Petitioner forfeited direct state appellate review of his *Batson* claim, the State failed to raise a procedural default defense before the district court. The State also declined to argue that the Michigan Court of Appeals, on collateral review, treated the *Batson* ineffective assistance claim only as cause to excuse the procedural default. Instead, the State took the position before the district court that the Michigan appellate court decided the *Batson* claims on the merits. *Drain v. Woods*, 902 F. Supp. 2d 1006, 1019 (E.D. Mich. 2012). The district court concluded that it was not required to raise the procedural default issue *sua sponte* and decided to address Drain's claims on the merits. *Id.* (citing *Trest v. Cain*, 522 U.S. 87, 89 (1997) (explaining that "a court of appeals is not 'required' to raise the issue of procedural

default sua sponte.") and *Flood v. Phillips*, 90 F. App'x 108, 114 (6th Cir. 2004) ("The state was required to assert procedural default as an affirmative defense in its responsive pleading.")).

Normally, the failure to present a claim to a state court constitutes a procedural default. *Lovins v. Parker*, 712 F.3d 283, 295 (6th Cir. 2013) ("[A] claim is procedurally defaulted where the petitioner failed to exhaust state court remedies, [which] are no longer available . . . ."). *See also In re Abdur'Rahman*, 392 F.3d 174, 186 (6th Cir. 2004) (en banc) (describing one form of procedural default as "forfeiture by failure to exhaust"), *vacated on other grounds by Bell v. Abdur'Rahman*, 545 U.S. 1151 (2005). The State asserts that because procedural default is not a jurisdictional matter, this Court is "permitted to consider the procedural default issue even when raised for the first time on appeal." *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2005). *See also Trest*, 522 U.S. at 89 ("A court of appeals is not 'required' to raise the issue of procedural default *sua sponte* . . . . a procedural default . . . is not a jurisdictional matter."). The State requests that this Court raise procedural default. Respondent's First Brief at 27.

In response, Petitioner asserts that the State's failure to raise the procedural default defense constituted waiver, rather than mere forfeiture. In fact, the State asserted in its answer before the district court that "the [Michigan] appellate courts reached the merits of [the *Batson* and related ineffective assistance of counsel] claims" and "rejected them." (R. 8, Answer, at PageID# 275, 277.) The State was aware of the procedural default defense and actually raised it in response to some of Petitioner's claims, but failed to raise it against the *Batson* and related ineffective assistance claims. Respondent's Fourth Brief at 4.

This Court need not distinguish between forfeiture and waiver in this case because the State agrees that the procedural default defense cannot be directly asserted for the first time on appeal. Instead, the State relies on this Court to raise the defense *sua sponte*. The State has not

presented a compelling reason for its failure to raise the procedural default and merely insists that Petitioner would not be substantially prejudiced if this Court were to raise the issue *sua sponte*. We choose not to raise the issue *sua sponte*, and instead, we review the *Batson* claim and related ineffective assistance claim on the merits under AEDPA, as the state court of appeals *did* issue a decision regarding the merits of those claims.

**2.      Clearly Established Law**

The Equal Protection Clause commands that "no state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Supreme Court has consistently held that "the Equal Protection Clause prohibits a prosecutor from using the State's peremptory challenges to exclude otherwise qualified and unbiased persons from the petit jury solely by reason of their race[.]" *Powers v. Ohio*, 499 U.S. 400, 409 (1991). The Supreme Court recognized in *Batson* that "[t]he harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." *Batson*, 476 U.S. at 87. Use of peremptory strikes based impermissibly on race affects the rights of each impermissibly stricken venireperson as well as the rights of the criminal defendant. *Powers*, 499 U.S. at 404 and 406-08. Once a *Batson* violation has been found, the trial court must implement an adequate remedy to cure the jury of the taint of selection by impermissible racial discrimination. *Batson*, 476 U.S. at 99, n.24.

Significantly for the present case, the Supreme Court has directly held that even a single racially motivated peremptory strike by the prosecutor requires relief. *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) (citing and quoting *United States v. Vazquez-Lopez*, 22 F.3d 900, 902 (9th

Cir. 1994) ("[T]he Constitution forbids striking even a single prospective juror for a discriminatory purpose."). Indeed, *Batson* held that "'[a] single invidiously discriminatory governmental act' is not 'immunized by the absence of such discrimination in the making of other comparable decisions.'" 476 U.S. at 95 (citing and quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266, n. 14 (1977)). *See also Powers*, 499 U.S. at 412 ("A prosecutor's wrongful exclusion of *a juror* by a race-based peremptory challenge is a constitutional violation committed in open court[.]" (emphasis added)).

A *Batson* claim presents a mixed question of law and fact, which "focuses on the reasonableness of the decisions of the state courts—that is, whether those decisions constituted an unreasonable application of Supreme Court precedent." *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003). In addition, however, a *Batson* challenge regarding whether the prosecutor intended to discriminate impermissibly based on race is "a question of historical fact." *Id.* at 429. "Under AEDPA, primary or historical facts found by state courts are presumed correct and are rebuttable only by clear and convincing evidence." *Braxton v. Gansheimer*, 561 F.3d 453, 459 (6th Cir. 2009) (internal quotation marks omitted). *See also Snyder v. Louisiana*, 522 U.S. 472, 477 (2008) ("On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous. The trial court has a pivotal role in evaluating *Batson* claims.") (internal citations omitted).

Courts conduct a three-step analysis to determine whether a *Batson* violation has occurred, the first step of which asks whether the defendant has made "a prima facie showing that a peremptory challenge has been exercised on the basis of race." *Miller-El v. Cockrell*, 537 U.S. 322, 328 (2003) (citing *Batson*, 476 U.S. at 96-97). If that step is met, under step two, "the burden of production shifts to the proponent of the strike to come forward with a race-

neutral explanation" for the strike. *Purkett v. Elem*, 514 U.S. 765, 767 (1995). If such a race-neutral explanation is provided, a court determines under step three "whether the defendant has shown purposeful discrimination." *Cockrell*, 537 U.S. at 328–29.

### 3. The Existence of a *Batson* Violation

#### a. *Batson* Step 1

To prevail under the first step, a petitioner must establish a *prima facie* case of purposeful discrimination in the selection of the jury. *Miller-El v. Cockrell*, 537 U.S. at 328 (citing *Batson*, 476 U.S. at 96–97). First, "[Petitioner] must show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of [his] race." *Batson*, 476 U.S. at 96 (internal citation omitted). Next, Petitioner "is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate." *Id.* (internal quotation marks omitted). "Finally, [Petitioner] must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Id.* In determining whether this last requirement is met, a court considers "all relevant circumstances," including a "'pattern' of strikes against black jurors" and the questions and statements made by the prosecutor during *voir dire*. *Id.* at 96-97.

The Michigan trial court found a *prima facie* case of purposeful discrimination. As to the first and second elements of the *prima facie* case, Petitioner is African American, and seven of the prosecutor's nine excluded jurors were also African American.[5] The trial court then found

---

[5] Because one of these seven jurors has an Hispanic surname ("Gutierriez") the Michigan Court of Appeals described her race as Hispanic rather than African American. The trial court, however, found that the prosecutor struck "six black women and one black male" and included

that the third element of a *prima facie* case was met because the systematic exclusion of African American jurors and the mere exclusion of two white jurors was sufficient to establish an inference that the prosecutor impermissibly used race to exclude potential jurors.

The Michigan Court of Appeals, on the other hand, concluded "that a prima facie showing of purposeful discrimination was dubious at best" under the circumstances of this case. *Drain*, 2009 WL 127663, at *2. The court based this decision on the fact that the prosecutor excused two white jurors in addition to the seven African American individuals who were excused. Additionally, the court found compelling the fact that four African Americans remained on the final jury. Based on this evidence and relying especially on a Michigan Court of Appeals opinion purportedly applying *Batson*, *People v. Eccles*, 677 N.W.2d 76, 83 (Mich. Ct. App. 2004), the Michigan Court of Appeals held that the trial court erred on this first step.

Petitioner asserts two arguments as to how the Michigan Court of Appeals erred in its determination that the first *Batson* step was not met. First, he asserts that clearly established Supreme Court precedent applied in this case to render moot the preliminary issue of whether a *prima facie* showing was met. Second, he asserts that even if the mootness argument does not hold water, the facts established a *prima facie* case sufficient to raise an inference of discriminatory purpose.

Petitioner's argument regarding mootness is based on a Supreme Court plurality opinion and circuit court case law applying that opinion. In *Hernandez v. New York*, 500 U.S. 352, 359

---

Ms. Gutierriez in its discussion of the "black jurors" struck by the prosecutor. We follow the trial court's lead based in deference to its firsthand observations, though of course legally the issue is immaterial. Even if a defendant does not share the race of the stricken jurors, he or she has standing to assert a *Batson* claim on their behalf. *See Powers v. Ohio*, 499 U.S. 400, 416 (1991) ("[R]ace is irrelevant to a defendant's standing to object to the discriminatory use of peremptory challenges.").

(1991), a plurality of the Supreme Court stated that "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." The Supreme Court has subsequently relied upon the *Hernandez* plurality opinion in a number of cases. *See*, *e.g.*, *Snyder*, 552 U.S. at 477; *Miller-El*, 537 U.S. at 324; *Purkett*, 524 U.S. at 767-69. The State asserts that the mootness discussion in *Hernandez* is dicta and cannot qualify as clearly established law under § 2254(d)(1). *See Carey v. Musladin*, 549 U.S. 70, 74 (2006) (Clearly established Federal law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision.") (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). This Court has previously applied *Hernandez*'s mootness holding as clearly established law, *Lancaster v. Adams*, 324 F.3d at 434-35 (2003), and we see no reason to treat it otherwise now. Therefore, according to *Hernandez*, because the prosecutor provided race-neutral explanations for her strikes, and the trial court ruled on the ultimate question of intentional discrimination, whether the *prima facie* showing was met is a moot question.

Even setting aside the mootness argument, Petitioner still succeeds in establishing a *prima facie* case. The Michigan Court of Appeals' sole reasoning for rejecting the trial court's conclusion about the *prima facie* case was that the prosecutor struck two white jurors in addition to the seven black jurors, and that four black jurors remained on the jury. The Michigan appellate court's analysis was premised on the following statement from *People v. Eccles*, 677 N.W.2d 76, 83 (Mich Ct. App. 2004): "That the prosecutor did not try to remove all blacks from the jury is strong evidence against a showing of discrimination."

But that case is manifestly contrary to clearly established federal law that "'[a] single invidiously discriminatory governmental act' is not 'immunized by the absence of such discrimination in the making of other comparable decisions,'" *Batson*, 476 U.S. at 95, and that a single racially discriminatory peremptory strike requires reversal, *Snyder*, 552 U.S. at 478. *See also J.E.B. v. Alabama ex rel T.B.*, 511 U.S. 127, 142 n.13 (1994) ("The exclusion of even one juror for impermissible reasons harms that juror and undermines public confidence in the fairness of the system."). Nor does Supreme Court precedent allow a court to require any certain racial configuration of peremptory strikes at the *prima facie* stage, much less to find that failing to strike black jurors is "strong evidence" *against* discrimination. *Cf. Eccles*, 677 N.W.2d at 83. As the Supreme Court instructed in *Batson*, "[f]or evidentiary requirements to dictate that several must suffer discrimination before one could object would be inconsistent with the promise of equal protection to all." 476 U.S. at 95-96 (internal citation and quotation marks omitted). In light of this clear instruction, the Michigan Court of Appeals unreasonably applied Supreme Court law to reject the *prima facie* showing of discrimination in this case merely because some black venirepersons remained on the panel.

The Supreme Court has explained that "a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson v. California*, 545 U.S. 162, 170 (2005). "[A] 'pattern' of strikes against black jurors included in the particular venire" can, if present, "give rise to an inference of discrimination" establishing a *prima facie* case. *Batson*, 476 U.S at 97. Here, the prosecutor used seven of her nine peremptory strikes to remove minority venirepersons from the jury. The prosecutor peremptorily struck three minority jurors in a row before striking a Caucasian juror. The prosecutor then struck four more minority venirepersons before again

striking a Caucasian individual. As the Michigan Court of Appeals dissenting judge indicated, "[s]tatistically, the prosecutor exercised 78 percent of her peremptory challenges to exclude minorities, despite the fact that minorities composed only 28 percent of the venire at its inception, and 31 percent at its conclusion." *Drain*, 2009 WL 127663, at \*14. This pattern of strikes is sufficient to give rise to an inference of discrimination and satisfies the *prima facie* requirement.

### b.     *Batson* Step 2

Under the second *Batson* step, the burden shifts to the prosecutor, who must provide race-neutral explanations for each of the challenged peremptory strikes. At this step, the reason for a strike need not be "persuasive, [n]or even plausible." *Purkett*, 514 U.S. at 767-68. Neither party contests that the prosecutor offered facially race-neutral explanations for each of the peremptory strikes she exercised against African Americans.

The Michigan Court of Appeals found, and the State argues on appeal, that the trial court impermissibly combined the second and third steps in its *Batson* analysis by requiring the prosecutor to offer reasons that were both race neutral (step two) and persuasive (step three), in effect shifting the burden of proof. The district court disagreed, concluding that after the prosecutor presented the race-neutral explanations, the trial court rejected each of the prosecutor's explanations and found that the explanations were pretextual.

We conclude that the district court was correct. The prosecutor was given the opportunity to provide her reasons, and the court then proceeded to the third step of *Batson* and pronounced the view that the reasons offered by the prosecutor were not credible and legitimate. The trial court sufficiently separated the two steps, first listening to the prosecutor's proffered reasons for each peremptory strike, and next deciding that these reasons were pretextual,

evidencing purposeful discrimination. Regardless, the Michigan Court of Appeals did not base its conclusion on this alleged lack of separation and continued on to conclude that Petitioner could not prevail at the third step under *Batson*.

### c.  *Batson* **Step 3**

Under this third step, a court must determine "the persuasiveness of the prosecutor's justification for his peremptory strike[s]." *Cockrell*, 537 U.S. at 338-39. At step three, "the challenging party, who always bears the ultimate burden of persuasion, must show that the explanation is merely a pretext for a racial motivation." *Braxton*, 561 F.3d at 459.

The Supreme Court has recognized that purposeful discrimination may be proven in a variety of ways, depending on the circumstances of the case. Since *Batson*, the Court has held that "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination."[6] 476 U.S. at 97. *See also Dretke*, 545 U.S. at 240-41 (citing a pattern of prosecution strikes against eligible black jurors). Comparisons between jurors may reveal disparate treatment. *Dretke*, 545 U.S. 231, 241 (2005) ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination."); *see also Snyder*, 552 U.S. at 483-94 (holding that a *Batson* violation was proven where the prosecutor's stated reason for striking a black student applied equally to two white businessmen who were not struck by the prosecutor). The prosecutor's divergent questioning of jurors of different races may also be relevant to discrimination. *Cockrell*, 537 U.S. at 332. The Court has also found

---

[6] Although this statement was in reference to the *prima facie* case, the Court subsequently stated unequivocally that "evidence demonstrating that, despite the neutral explanation of the prosecution, the peremptory strikes in the final analysis were race based . . . . includes the facts and circumstances that were adduced in support of the prima facie case." *Cockrell*, 537 U.S. at 340.

evidence of discrimination where a prosecutor misrepresented a juror's testimony and relied on that mischaracterization as a rationale for striking the juror. *Dretke*, 545 U.S. at 244. In the same vein, the Court has held that a prosecutor's "proffer of [a] pretextual explanation naturally gives rise to an inference of discriminatory intent." *Snyder*, 552 U.S. at 485 (citing *Dretke*, 545 U.S. at 252 as "noting the 'pretextual significance' of a 'stated reason [that] does not hold up'"). Importantly, "[a] *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a [court] can imagine a reason that might not have been shown up as false." *Dretke*, 545 U.S. at 252. In determining whether a given reason is pretext, the issue will frequently "come[] down to whether the trial court finds the prosecutor's race-neutral explanations to be credible." *Cockrell*, 537 U.S. at 339; *see also id.* at 339-40 ("The credibility of the prosecutor's explanation goes to the heart of the equal protection analysis").

The Supreme Court has instructed that "a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Snyder*, 552 U.S. at 477. Indeed, "the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge." *Id.* (quoting *Hernandez*, 500 U.S. at 365 (plurality opinion)). The trial court is also best situated to determine "whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Id. See also Batson*, 476 U.S. at 98 n.21 ("Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference.")

Each of these cases was decided before 2009 and thus was clearly established law when the Michigan Court of Appeals reversed the trial court's finding that Petitioner was entitled to relif because of the uncured *Batson* violations in the selection of the jury that convicted him.

In considering how this clearly established law might reasonably be applied to the facts of this case, it should be remembered that during *voir dire* the trial court found the prosecutor's race-neutral explanations not credible and determined that the prosecutor "consistently excluded black jurors based on their race" in violation of *Batson*. (R. 8-4, at 634.) On post-conviction review, the trial court reiterated this finding.

The Michigan Court of Appeals, however, held that the record did not support the trial court's finding of a *Batson* violation at step three. *Drain*, 2009 WL 127663, at *3-4. First, the appeals court noted that in the *Batson* colloquy the trial court had incorrectly identified three white jurors as expressing doubt about a drug user's credibility, when in fact the jurors in question had not made such statements. *Id.* at *3. Second, the appeals court cast doubt on the trial court's finding that Mr. Reger, the white university student who was allowed to remain on the jury, was "obviously the youngest juror" present because Mr. Reger's "age [was] not revealed" in the record. *Id.* The appeals court then wrote, apparently referring to both the age issue and the finding that white jurors had similar reservations about a drug user's testimony as black jurors:

> Even if the trial court was correct, "*Batson* is not violated whenever two veniremen of different races provide the same responses and one is excused and the other is not. This is so because counsel must be entitled to make credibility determinations in exercising peremptory challenges." *Matthews v. Evatt*, 105 F.3d 907, 918 (C.A. 4, 1997) (citations omitted).

*Id.* at *3. Third, the appeals court suggested that the fact the prosecutor sought to challenge for cause, and later struck, a white juror who expressed reluctance to believe a drug user's testimony

showed that the prosecutor indeed struck both black and white jurors for the same reason.[7] *Id.* at

*4. Fourth, the appeals court conceded that "one of the prosecutor's explanations for a

peremptory challenge was unsupported by the record," and acknowledged that Ms. Trotter had

never stated that she would require the prosecution to prove its case beyond "a shadow" of

doubt. *Id.* However, the appeals court thought this false reason was not proof of discrimination:

> Implausible justifications for the exercise of a peremptory challenge *may* support a finding of pretext for discrimination. We conclude, however, the lack of record support did not give rise to a pretext for discrimination in this case. Indeed, the record did not contradict any of the prosecutor's other reasons for challenging black jurors--several of which were identical to the prosecutor's reason to remove a white juror for cause (i.e., that the juror could not fairly evaluate a drug user's testimony). Also, the prosecutor indicated that she waited to challenge Trotter because she "wanted to see what the rest of the composition of the jury was like before I made the decision to dismiss [Trotter]." As previously noted, the fact that four black jurors remained on the panel in this case "is strong evidence against a showing of discrimination." *Eccles, supra.* In addition, it is worth noting that at the *Batson* hearing, the trial court only assessed discriminatory intent as it related to the challenged black jurors collectively. Had the court assessed such intent on a case-by-case basis, it may have found the prosecutor's reasons for exercising her peremptory challenges credible. This, in turn, would have undercut any inference that the single challenge at issue (i.e., the challenge of Trotter) was racially motivated. Thus, it appears the prosecutor, in attempting to recall the reasons for seven peremptory challenges, provided a mistaken reason out of oversight rather than out of discrimination. Consequently, there was no *Batson* violation in this case.

*Id.* at *4 (citation omitted).

We conclude that the appellate court's determination that no *Batson* violation occurred,

based on the reasoning just described, was unreasonable or contrary to clearly established federal

law with regard to at least three of the jurors: Ms. James, Ms. Gutierriez, and Ms. Trotter.

---

[7] In the same vein, the appeals court wrote that "because the trial court did not permit the prosecutor to explain the basis for her peremptory challenges of white jurors, it was impossible for the court to have adequately evaluated the prosecutor's proffered race-neutral explanations because the prosecutor may have excused both white and black jurors for the same reasons." *Id.* at *3.

###### i.     Loretta James

The prosecutor's rationale for striking Ms. James is that she said something in *voir dire* that caused the prosecution to "question whether she was gonna listen to the testimony of a person that's a drug user and second police officers, and that is my case, as objectively as she might a plumber or carpenter or whatever." (R. 8-4, at 630.)  At least as to police officers, this rationale cannot be correct because Ms. James said nothing about police officers, and was asked nothing about police officers.[8]

As to the credibility of drug users, the prosecutor questioned Ms. James at the same time she questioned Ms. Richards, a white juror who was not struck:

> [Prosecutor]: What if it turned out that one of the witnesses in the case was a drug user?  Would you Miss Richards, automatically reject what this person has to say simply because she is a drug user?
>
> [Richards]:  Not automatically, no.
>
> [Prosecutor]:  You would be a little suspicious?
>
> [Richards]: I might be.
>
> [Prosecutor]:  And you want to understand well what did you see and what condition were you in when you saw it?
>
> [Richards]: Yes.
>
> [Prosecutor]:  Would you question, Miss James, what her ability to perceive might have been at the time?

---

[8] The lack of any factual support for this part of the prosecutor's explanation alone is evidence of pretext. *Dretke*, 545 U.S. at 252 ("If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.").  The state appeals court did not consider this element of the prosecutor's explanation for striking Ms. James, perhaps because of its mistaken legal conclusion that the strike did not matter in light of the black jurors who were not struck. *See Drain*, 2009 WL 127663, at *4 (acknowledging that the prosecutor's reason for striking Johnnie Trotter was not supported by the record, but declining to regard it as evidence of discrimination because "the fact that four black jurors remained on the panel in this case 'is strong evidence against a showing of discrimination.'") (quoting *Eccles*, 677 N.W.2d at 76).

[James]: Yes, I would.

[Prosecutor]: Okay. Do you think that it's possible for someone to be a drug user and see something and relate it?

[James]: Well it depend on what kind of condition, like you said, they are in. Cause they can be spaced out at the time.

[Prosecutor]: Could be, you recognize, though, that drug users aren't necessarily spaced out 24-7, right?

[James]: Right.

(R. 8-3, Tr. Transcript, June 11, 2002, PageID# 383-84.) On this basis, it is difficult to perceive any meaningful difference between the testimony of Ms. James and the testimony of Ms. Richards. Ms. Richards, a white juror, was asked the leading question of whether she would "automatically reject" a drug user's testimony, so she answered that no, she would not. Ms. James was not given this prompt, but even without it her testimony was not substantially different: she stated that she would question the ability of a drug user to perceive something, but clarified that his or her ability to perceive would depend on his or her condition at the time.

The colloquy that immediately followed this exchange removes any possible doubt that the prosecutor understood Ms. James' testimony; the colloquy also illustrates the similarity between Ms. James' statements and the expressed beliefs of other jurors on the panel. After a short break, the prosecutor posed the following question to the rest of the fourteen members of the venire who had been called to the jury box.[9]

[Prosecutor]: Okay. I think as Miss James indicated you would want to know something about whether they were high at that time so that you can assess whether their perceptions might be affected by the drug use. Does that seem reasonable?

---

[9] This initial group of fourteen included two of the white juror that the trial court later named as expressing concern about the credibility of drug users: Ms. Richards and Ms. Hallam.

Prospective jurors: Yes.

[Prosecutor]: Does everyone agree? All right.

(*Id.* at 387-88).

Various white jurors testified to similar views during *voir dire*, yet the prosecutor did not strike them and they served on Petitioner's jury. Craig Schuler, a white juror who replaced Ms. Gutierriez, stated that he thought drugs affected a person's ability to perceive.[10] White juror Denise Cosgrove stated that she would subject a drug user's testimony to closer evaluation.[11] Paul Reger, the white university student, indicated his belief that people behave differently under the influence of drugs.[12] White juror Donna Wright stated that she thought drugs affected a person's ability to perceive and that she would question the testimony of someone who was under the influence of drugs.[13]

Perhaps, in an AEDPA posture, there is a reasonable argument about whether the trial court's rejection of the prosecutor's rationale related to drug user testimony should be given deference in light of the judge's factual mistake in listing three white jurors who in fact did not voice concern about a drug user's credibility. *Cf. Snyder*, 552 U.S. at 477 ("A trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous.").

---

[10] "[Defense counsel]: Do you think that drugs affect a person's ability to perceive? [Mr. Schuler]: They can, sure." (R. 8-4 at 519.)
[11] "[Defense counsel]: Have you ever been around anybody who was under the influence of narcotics to your knowledge? [Ms. Cosgrove]: Yes. [Defense counsel]: If that person while under the influence of narcotics testified would you want to evaluate what they were saying a little bit closer. [Ms. Cosgrove]: Yes, I would." (R. 8-4 at 555.)
[12] "[Prosecutor]: People behave differently when they are under the influence [of some sort of drug], right? [Mr. Reger]: Yes." (R. 8-4 at 593.)
[13] "[Defense Counsel]: Do you think that drugs affect a person's ability to perceive? [Ms. Wright]: Yes, I do. [Defense counsel]: Would you question the testimony? [Ms. Wright]: I don't know about drugs, but I would think they would have an effect on them. [Defense counsel]: Would you question the testimony or the credibility of someone who was under the influence of drugs? [Ms. Wright]: Sure." (R. 8-4 at 529.)

However, even setting aside the trial court's finding, we do not think fair-minded jurists could reasonably debate that Ms. James was treated differently than similarly-situated white jurors. Indeed, the reasoning of the Michigan Court of Appeals to the contrary depends either on case law that conflicts with Supreme Court precedent or constitutes a patently unreasonable application of *Batson* to the record.

The state appeals court appears to have dismissed the differential treatment of white jurors because it believed that "*Batson* is not violated whenever two veniremen of different races provide the same responses and one is excused and the other is not." *Drain*, 2009 WL 127663 at *4 (quoting *Matthews*, 105 F.3d at 918). This point of law, however, was even then directly contrary to Supreme Court precedent. *See Snyder*, 552 U.S. 472 (finding a *Batson* violation where the rationale for striking a black juror applied equally well to a white juror); *Dretke*, 545 U.S. at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination.").[14]

Next, the state appeals court suggested that if white jurors were also struck based on their statements about drug users, then the challenged strikes of black jurors on the same rationale may not have been discriminatory. On this record, though, to conclude that the prosecutor could have had similar grounds for using her peremptory challenges to strike Ms. James and the two white jurors—Elizabeth Malave and Richard Morris—would be patently unreasonable. Ms.

---

[14] Unsurprisingly, the Fourth Circuit has since renounced *Matthews* as abrogated by *Snyder* and *Dretke*. *See United States v. Barnette*, 644 F.3d 192, 205 (4th Cir. 2011). As Judge Gleicher noted in his dissent from the appellate court's decision, *Matthews*'s rationale that a prosecutor must be allowed room to assess the juror's credibility "qualifies as illogical. If counsel exercising a peremptory challenge may avoid the consequences of a discriminatory choice merely by employing a 'credibility' argument, *Batson*'s third step has no meaning at all." 2009 WL 127663 at *18 (Gleicher, J., dissenting).

Malave was not asked anything about a drug user's testimony, so it is simply not reasonable to suppose she could have been excused based on her views about drug users. Mr. Morris, on the other hand, testified to views far more extreme than Ms. James. Immediately upon joining the panel on the second day, Mr. Morris informed the court, "I really don't think I will be acceptable as a juror." (R. 8-4, at 490). He went on to say that he spent fifteen years as a drug user. He said that based on that experience, "I can't believe a thing from anybody, and that includes the police." (*Id.* at 491.) He testified that he could probably be more fair to Petitioner than to the prosecutor. He explained:

> I'm very hesitant to believe anyone that [prosecutors] bring up cause I have seen in many cases they bring people in there, the police get somebody and say now you are gonna go to court and you are gonna say this or that, okay. You are gonna squeal on someone or else you're going to prison. And I've seen that happen.

(*Id.* at 492-93.)

Even ignoring the other *voir dire* testimony, we doubt that a fair-minded jurist could conclude that Ms. James' statement that she would want to know whether a drug user was high at the time he or she perceived the events in question is equivalent to the concerns expressed by Mr. Morris. In this case, however, we are not faced with that challenge. The record offers multiple white comparators whose statements were indistinguishable from Ms. James' statements. Those comparators include, at a minimum, Ms. Cosgrove (who stated that she would subject a drug user's testimony to closer evaluation) and Ms. Wright (who stated that she believed drugs affected a person's ability to perceive and that she would question the testimony of a drug user).[15]

---

[15] The district court also pointed to white venirepersons Shirley Sharpe and Kimberly Letourneau, who expressed concerns about a drug user's testimony but were not struck by the prosecutor. *Drain v. Woods*, 902 F. Supp.2d at 1023. Shirley Sharpe, in response to questioning

Fair-minded jurists could not disagree that Ms. James was similarly situated to, yet treated differently than, Ms. Wright and Ms. Cosgrove, and that under *Snyder* and *Miller-El*, the comparison is evidence of pretext. *See Snyder*, 552 U.S. 247; *Dretke*, 545 U.S. at 241. The Michigan Court of Appeals' conclusion relied on a statement in *Matthews* that was directly contrary to Supreme Court precedent. *Drain*, 2009 WL 127663 at *3 (quoting *Matthews v. Evatt*, 105 F.3d 907, 918 (4th Cir. 1997)). The Michigan Court of Appeals also unreasonably applied *Batson* to suggest that Ms. James was instead similarly situated to an ex-drug user who was struck by the prosecution after testifying that he would not credit prosecution witnesses with drug histories because he believed that drug users falsely testified to avoid charges.

Because the state appellate court's decision was an unreasonable application of clearly established federal law as to whether the prosecutor's peremptory challenge of Loretta James violated *Batson*, we grant it no deference. *Panetti v. Quarterman*, 551 U.S. 930, 948 (2007) ("no deference is due" where the state court's decision "constituted an unreasonable application of clearly established law as determined by [the Supreme] Court."); *Rice v. White*, 660 F.3d 242, 251-52 (6th Cir. 2011). We conclude that the prosecutor's rationale for excusing Ms. James was a pretext for discrimination. First, contrary to the prosecutor's explanation, Ms. James made no statements about police officers or how she would regard their testimony. "The prosecution's proffer of this pretextual explanation naturally gives rise to an inference of discriminatory intent." *Snyder*, 552 U.S. at 485. *See also Dretke*, 525 U.S. at 245-46 (citing the prosecutor's

---

by the prosecutor, testified that she would not automatically reject a drug user's testimony but that the credibility of his or her testimony would depend on the condition the person was in at the time. On follow up by the defense attorney, she agreed that she would want to be assured that the witness was not under the influence of drugs "before [she] would believe [the] testimony." (R. 8-4. at 488.) Ms. Letourneau testified that she grew up with a drug-addicted father, and that she believed that crack affected his ability to perceive. She also testified that her brother smokes marijuana daily, and that she would not believe something her brother said he saw when he was high. Both Ms. Sharpe and Ms. Letourneau were ultimately struck by the defense attorney.

misrepresentation of the juror's testimony as evidence of pretext). Second, we read the record as described above to demonstrate clearly that Ms. James was treated differently than white jurors who expressed similar views about drug users but were permitted to remain on the jury. The record thus establishes "evidence tending to prove purposeful discrimination." *Dretke*, 545 U.S. at 241. Although we need not defer to the trial court's partially erroneous finding about which white jurors expressed concerns similar to Ms. James, we note that the trial court's ultimate finding that the prosecutor's rationale regarding drug user testimony was not credible is consistent with our determination on review of the record.

### ii.      Leah Gutierriez

In explaining why she struck Leah Gutierriez, the prosecutor stated, "Frankly it was just the fact that Ms. Gutierriez was . . . much younger than any of the other persons. And in my experience, younger jurors don't always bring as much life experience to a case as they would like." (R. 8-4, at 631-32.) This was the sole reason given by the prosecutor for her strike. The trial court rejected this reason, stating "in terms of age, Paul Reger is a student. He is obviously the youngest juror on here and you don't find him offensive." (*Id.* at 634.)

The Michigan Court of Appeals expressed no disagreement with the trial court's determination of the relative ages of Ms. Gutierriez and Mr. Reger, pointing out only that "[a]lthough the record indicates that Reger was a student at Central Michigan University, his age is not revealed." *See Drain*, 2009 WL 127663 at *3. But the appellate court deemed the factual question irrelevant because "[e]ven if the trial court was correct, '*Batson* is not violated whenever two veniremen of different races provide the same responses and one is excused and the other is not.'" *Id.* (quoting *Matthews v. Evatt*, 105 F.3d at 918). As discussed above, this proposition is contrary to existing Supreme Court precedent and therefore could not excuse the

31

prosecutor's differing treatment of two jurors who were similarly situated except with respect to race. *See Snyder*, 552 U.S. at 482-84; *Dretke*, 545 U.S. at 241. Nor does the observation that Reger's age was "not revealed" in the record afford any basis for discarding the trial court's factual determination that Reger was "obviously the youngest juror" in the venire. *Batson*, 476 U.S. at 98 n.21 ("a reviewing court ordinarily should give [a trial court's] findings great deference."); *Snyder*, 552 U.S. at 477 (noting the significance of "a trial court's firsthand observations"). If the Michigan appellate court did reject the trial court's findings about the jurors' respective ages based on this silence in the record—something its opinion leaves unclear—that would constitute an unreasonable application of *Batson*.

Thus, as with Ms. James, we determine that the state appellate court's decision was an unreasonable application of clearly established federal law, and we decline to grant it deference. *Panetti*, 551 U.S. at 948. Reviewing the record, we have no trouble agreeing with the trial court that the prosecutor's strike against Ms. Gutierriez was racially motivated and in violation of *Batson*. As the dissenting judge from the Michigan Court of Appeals indicated, "Although Gutierriez did not reveal her age, she testified that she worked for the City of Detroit as a 'principle [sic] accountant,' and had previously served on a criminal jury '[a] long time ago." *See Drain*, 2009 WL 127663 at *19 (Gleicher, J., dissenting). These biographical facts tend to corroborate the trial court's finding. Recognizing the weight that should be accorded to the trial court's "firsthand observations," and finding no reason to believe the trial court was incorrect, we defer to the trial court's determination that the rationale proffered by the prosecutor with regard to Ms. Gutierriez was pretext for race discrimination. *Batson*, 476 U.S. at 98; *Snyder*, 552 U.S. at 477.

32

### iii.    Johnnie Trotter

The sole reason the prosecutor gave for striking Johnnie Trotter was Ms. Trotter's alleged statement that she would look to the prosecution to prove its case beyond "a shadow—I mean a reasonable doubt." (R. 8-4 at 632.) The prosecutor offered no other reason, and even stated "frankly, in hindsight, I wish I hadn't [struck her]." (*Id.*)

The Michigan Court of Appeals conceded that the prosecutor's explanation with regard to Ms. Trotter "was unsupported by the record." 2009 WL 127663 at *4. Although the court recognized that "[i]mplausible justifications for the exercise of a peremptory challenge may support a finding of discrimination," *id.* (citing *Purkett*, 514 U.S. at 768), it nonetheless concluded that "the lack of record support did not give rise to a pretext for discrimination in this case." *Id.* The state appellate court then cited three reasons why the unsupported strike was not probative of discrimination.

First, the appellate court found it relevant that "the record did not contradict any of the prosecutor's other reasons for challenging black jurors—several of which were identical to the prosecutor's reason to remove a white juror for cause (i.e., that the juror could not fairly evaluate a drug user's testimony)." *Id.* However, as demonstrated above, the record in fact showed that at least one black juror struck on that rationale, Ms. James, made statements more similar to white jurors who remained on the jury than to Mr. Morris, the white juror struck by the prosecution based on his history as a drug user. Even if the appellate court's reading of the record *could* be characterized as reasonable, the inference it seeks to draw is unacceptable under Supreme Court law that "[f]or evidentiary requirements to dictate that several must suffer discrimination before one could object would be inconsistent with the promise of equal protection to all." *Batson*, 476 U.S. at 96-97 (internal quotation marks and citation omitted). The Supreme Court has

repeatedly emphasized that "a stated reason [that] does not hold up" is probative of pretext. *Dretke*, 545 U.S. at 252; *Snyder*, 552 U.S. at 485 (citing *Dretke*). In *Dretke*, the Supreme Court held that a false reason is probative of pretext even where the prosecutor could have given another, more plausible, rationale for striking the juror. 545 U.S. at 252. Here, the state appellate court sought to look to evidence that was one step further removed from what the Supreme Court rejected in *Dretke*—i.e., the record concerning other peremptorily challenged jurors, as opposed to the record concerning the challenged juror. In doing so, it unreasonably applied clearly established Supreme Court law.

Next, the Michigan Court of Appeals cited the prosecutor's statement that she waited to see the composition of the rest of the jury before striking Ms. Trotter. The appellate court found this significant because it believed "the fact that four black jurors remained on the panel in this case 'is strong evidence against a showing of discrimination.' *Eccles*, *supra*." *Drain*, 2009 WL 127663 a *4. As we have already discussed, however, this statement from *Eccles* is contrary to decades of Supreme Court precedent, *Batson*, 476 U.S. at 95-96; *Snyder*, 552 U.S. at 478; *J.E.B.*, 511 U.S. at 142 n.13, and cannot support the appellate court's conclusion with regard to Ms. Trotter.

Next, the Michigan appellate court criticized the trial court's procedure and hypothesized that the trial court might have come to a different conclusion regarding Ms. Trotter had it examined the rationales on a juror-by-juror basis. Thus, the appellate court concluded "it appears the prosecutor, in attempting to recall the reasons for seven peremptory challenges, provided a mistaken reason out of oversight rather than out of discrimination. Consequently, there was no *Batson* violation in this case." *Drain*, 2009 WL 127663 at *4.

In *Dretke*, the Supreme Court acknowledged the difficulty lawyers may face in articulating their reasons for a peremptory challenge, but held that "when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives." 545 U.S. at 252. The Court in that case rebuffed an alternative rationale for striking the juror suggested by the Fifth Circuit. *Id.* at 250-52. Such post-hoc reasoning is unacceptable because "[a] *Batson* challenge does not call for a mere exercise in thinking up any rational basis." *Id.* at 252. Here, the appellate court did not even posit a possible legitimate basis the prosecutor could have relied on in striking Ms. Trotter. Instead, it simply suggested that the prosecutor "provided a mistaken reason out of oversight."[16] This analysis cannot be considered a reasonable application of clearly established federal law.

We conclude that the Michigan Court of Appeals unreasonably applied clearly established law in determining that the prosecution did not violate *Batson* in striking Ms. Trotter. The prosecutor must "stand or fall on the plausibility" of the reasons she stated, *Dretke*, 545 U.S. at 251, and her proffer of a false reason for striking Ms. Trotter "naturally gives rise to an inference of discriminatory intent," *Snyder*, 552 U.S. at 485. Our review of the record strengthens rather than undermines this conclusion, as Ms. Trotter was one of seven black jurors peremptorily struck by the prosecution, and at least two of the other jurors were struck for rationales justly rejected as not credible by the trial court.

In sum, the Michigan Court of Appeals unreasonably applied clearly established law in concluding that no *Batson* violation occurred in the selection of Petitioner's jury. Our own

---

[16] We note that this rationale for the prosecution's false statement is particularly unconvincing as to Ms. Trotter, who was the last juror the prosecutor struck before the trial court raised the *Batson* issue.

review of the record convinces us that the trial court was correct in finding that the prosecutor "consistently excluded black jurors based on their race" in violation of *Batson*, 476 U.S. 79.

### 4.    The Trial Court's Failure to Remedy the *Batson* Violation

We thus conclude that the trial court was correct in determining during *voir dire* that the prosecutor violated *Batson* by deliberately striking black jurors on the basis of their race. However, the trial court committed constitutional error when it failed to remedy the acknowledged *Batson* violations and allowed Petitioner to be tried by a jury that had been selected by racially impermissible means. Because the Michigan Court of Appeals did not reach the issue of remedy, concluding as it did that no *Batson* violation occurred, we do not apply AEDPA deference to this issue. [17]

Once a *Batson* violation has been found, it must be remedied. "The defendant [has] the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." *Batson*, 476 U.S. at 85-86. *See also Powers*, 499 U.S. at 404 ("For over a century, this Court has been unyielding in its position that a defendant is denied equal protection of the laws when tried before a jury from which members of his or her race have been excluded by the State's purposeful conduct."); *Rice*, 660 F.3d at 258-60 (granting habeas where trial court allowed a *Batson* violation to go uncured).

Thus, in order to adequately safeguard a defendant's rights, a remedy must undo the effects of the racially discriminatory strikes. *Rushen v. Spain*, 464 U.S. 114, 119-20 (1983) ("The adequacy of any remedy is determined solely by its ability to mitigate constitutional error,

---

[17] Nor could we reach another result applying AEDPA deference. Under clearly established law, a criminal defendant's constitutional rights are violated when he is tried by a jury that has been selected through racially discriminatory means. *Batson*, 476 U.S. at 85-87. The trial court did nothing to cure the effects of the improper strikes on the composition of the jury, thus there is no reasonable argument that the trial court adequately remedied the violation.

if any, that has occurred."); *Milliken v. Bradley*, 433 U.S. 267, 280 (1977) (the remedy "is to be determined by the nature and scope of the constitutional violation."). As we have previously explained, "[t]he two primary remedies for a *Batson* violation available to a trial court are first, disallowing the improper strike, and second, discharging the entire venire and starting anew." *Rice*, 660 F.3d at 259. *See also Batson*, 476 U.S. at 99, n.24 (identifying these two remedies and expressing no view of which may be "more appropriate in a particular case").

The trial court in Petitioner's case did not implement either of these remedies, but rather allowed *voir dire* to proceed with the sole requirement that the prosecutor request permission from the court before using any more peremptory challenges against black jurors. While this measure may have been a sound precaution against further racial discrimination, it plainly failed to cure the jury of the effects of the earlier discriminatory strikes. On the motion of the prosecutor, the trial court excused the last venireperson, a black man, for cause. After he was excused, thirteen jurors remained on the panel. Rather than summon a new venire, the trial court and the attorneys agreed to proceed with only one alternate. This decision, if intended as a remedy, was also plainly inadequate to cure the *Batson* violation. Nor does it make any difference that the improperly struck jurors may not have been available to be reinstated on the jury: "if stricken veniremembers are dismissed and later found to be part of a pattern of discriminatory strikes, the only remaining remedy for the *Batson* violation would be to discharge the entire venire and start the process anew." *People v. Knight*, 701 N.W.2d 715, 729 (Mich. 2005).

"In the absence of any remedial action undertaken by the trial court, the existence of an unmitigated *Batson* violation requires that the conviction be vacated." *Rice*, 660 F.3d at 260 (citing *Batson*, 476 U.S. at 100). *See also United States v. Tomlinson*, 764 F.3d 535, 539 (6th

Cir. 2014) ("*Batson* error is structural and is not subject to harmless error review"). Accordingly, the district court correctly determined that Petitioner was entitled to a conditional writ of habeas corpus on his *Batson* claim.

## C. Ineffectiveness Assistance of Counsel Related to Batson Claim

### 1. Legal Framework

The Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), constitutes clearly established federal law on the issue of ineffective assistance of counsel. Under the test laid out in *Strickland*, a petitioner must first demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. Here, the law presumes "that counsel will fulfill the role in the adversary process that the [Sixth] Amendment envisions." *Id*. Therefore, rather than "second-guess[ing] counsel's assistance after conviction or adverse sentence," a federal court's review of counsel's performance is generally highly deferential. *Id*. at 689. A petitioner must also demonstrate that counsel's ineffective assistance prejudiced his case. To prevail on this second prong, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. In making such a determination, this Court must consider how the *Strickland* test and AEDPA interact. A petitioner

> must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance, because under 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. Rather, he must show that the [state court of appeals] applied *Strickland* to the facts of his case in an objectively unreasonable manner.

*Bell v. Cone*, 535 U.S. 685, 698-99 (2002) (internal citation omitted). This requirement makes the burden even more difficult for a habeas petitioner.

The Michigan Court of Appeals based its conclusion that the trial court erred in finding Petitioner's counsel was ineffective on the fact that a *Batson* violation had not occurred in his case. The court stated, "There being no *Batson* violation, we conclude that the trial court erred in finding that defendant's counsel was ineffective. 'Defense counsel is not required to make a meritless motion or a futile objection.'" *Drain*, 2009 WL 127663, at \*4 (quoting *People v. Goodin*, 668 N.W.2d 392, 397 (Mich. Ct. App. 2003)). The state appellate court's decision on the ineffective assistance of counsel issue thus rests entirely on its holding with regard to the *Batson* issue, which we have already determined was contrary to and an unreasonable application of Supreme Court law; therefore, we grant it no deference. *Panetti*, 551 U.S. at 948.

### 2. Analysis

#### a. Deficient Performance

The district court found that defense counsel's failure to object to the prosecutor's use of peremptory challenges to eliminate African Americans from the jury panel constituted ineffective assistance of counsel. The court stated, "Counsel's passivity in light of an obvious pattern of strikes against minority prospective jurors fell below an objective standard of reasonableness and amounted to deficient performance." *Drain*, 902 F. Supp. 2d at 1025 (citing *Richardson v. Hardy*, 855 F. Supp. 2d 809, 823, n.3 (N.D. Ill. 2012)). Beyond an Illinois district court opinion, the district court apparently found no additional case law to demonstrate that counsel's assistance was so deficient "that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. As the district court acknowledged in its opinion, the state trial court raised the issue *sua sponte* on Petitioner's behalf after watching the prosecutor strike seven African Americans and only two Caucasians

from the venire. Four African Americans remained on the jury, even after the prosecutor *and* Petitioner's attorney struck a number of African Americans.

We need not decide in this case, however, whether counsel's passivity in the face of the prosecutor's repeated strikes against African American jurors was constitutionally deficient under *Strickland,* because defense counsel's failure to object to the manner in which the trial court dealt with the *Batson* violation did constitute deficient counsel. After the trial court concluded that jurors were struck for impermissible, racially discriminatory reasons and a *Batson* violation had occurred, the trial proceeded with a jury drawn by discriminatory means in violation of the Equal Protection Clause. The fact that a *Batson* error is structural and requires an adequate remedy lends itself to a conclusion that a failure to object in this case constituted deficient counsel. The required remedy for a *Batson* violation is clearly established—there is no question that the trial court's failure to cure the violation was contrary to the law of the Supreme Court. *Batson* and it progeny command that where a juror is impermissibly stricken on the basis of race, a trial court must undo the effects of the racially discriminatory strikes on the composition of the jury. Petitioner's trial counsel failed to assert either of *Batson*'s two primary, well established remedies and instead sat silently as the trial court allowed *voir dire* to proceed with the bare requirement that the prosecutor request permission before using any more peremptory strikes to exclude African American jurors—unquestionably an improper and inadequate remedy. After the trial court announced its finding that a *Batson* violation had occurred, any reasonable attorney would have objected to the trial court's decision to proceed without either recalling those who were dismissed or beginning *voir dire* again with an entirely new venire.

### b.     Prejudice

The district court properly found that this deficient counsel prejudiced Petitioner's defense.  The court stated that "[b]ut for counsel's . . . failure to suggest the proper remedy, there is a substantial probability that the trial court would have followed the proper procedures and ordered a new panel of jurors not previously associated with the case." *Drain*, 902 F. Supp. 2d at 1026.

The state trial court had already determined that a *Batson* violation had occurred.  Had counsel either objected to the use of peremptory strikes or to the trial court's handling of the *Batson* violation, the jury would either have been dismissed or the dismissed individuals would have been brought back into the courtroom to serve on the jury.  Because a *Batson* violation constitutes a structural error, the failure to object and to remedy the error constitutes error *per se.* Where counsel's ineffective representation lets stand a structural error that infects the entire trial with an unconstitutional taint, there is no question that Petitioner and our system of justice suffered prejudice.

Therefore, the district court did not err in concluding that Petitioner suffered ineffective assistance of counsel and that habeas relief was warranted on that claim.

## III.

## CONCLUSION

For the foregoing reasons, this Court **AFFIRMS** the district court's decision conditionally granting habeas relief.